## CALIFORNIA DEPARTMENT OF HUMAN RESOURCES DEVELOPMENT ET AL. *v.* JAVA ET AL.

No. 507.   Argued February 24, 1971—Decided April 26, 1971

BURGER, C. J., delivered the opinion for a unanimous Court. DOUGLAS, J., filed a concurring opinion, *post,* p. 135.

*Asher Rubin,* Deputy Attorney General of California, argued the cause for appellants.   With him on the brief was *Thomas C. Lynch,* Attorney General.

*Stephen P. Berzon* argued the cause for appellees *pro hac vice.*   With him on the brief was *Kenneth F. Phillips.*

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Gray, Robert V. Zener,* and *Peter G. Nash* for the United States; by *Duke W. Dunbar,* Attorney General, *John P.*

*Moore,* Deputy Attorney General, and *Robert L. Harris,* Assistant Attorney General, for the State of Colorado; by *Robert M. Robson,* Attorney General, and *R. LaVar Marsh,* Assistant Attorney General, for the State of Idaho; by *Francis B. Burch,* Attorney General, and *Louis B. Price,* Special Assistant Attorney General, for the State of Maryland, joined by the State of Illinois; by *Warren B. Rudman,* Attorney General, and *William F. Cann,* Deputy Attorney General, for the State of New Hampshire, joined by *David M. Pack,* Attorney General, and *Lance D. Evans,* Assistant Attorney General, for the State of Tennessee; by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Brenda Soloff,* Assistant Attorney General, for the State of New York; by *Paul W. Brown,* Attorney General, and *Franklin R. Wright,* Assistant Attorney General, for the State of Ohio; and by *Willard Z. Carr, Jr.,* for the Southern California Edison Co. et al.

Briefs of *amici curiae* urging affirmance were filed by *C. Lyonel Jones, Ed J. Polk, Don B. Kates, Jr.,* and *Joseph A. Matera* for California Rural Legal Assistance et al.; by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for American Federation of Labor and Congress of Industrial Organizations; by *Stephen I. Schlossberg, John A. Fillion,* and *Jordan Rossen* for the International Union, UAW; and by the Employment Project, Center on Social Welfare Policy and Law.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case raises the issue of whether a State may, consistent with § 303 (a)(1) of the Social Security Act, suspend or withhold unemployment compensation benefits from a claimant, when an employer takes an appeal from an initial determination of eligibility. Section

303 (a)(1) of the Social Security Act, 49 Stat. 626, as amended, 42 U. S. C. § 503 (a)(1), provides that benefits must be paid "when due."

In late summer 1969, appellees Judith Java and Carroll Hudson, having been discharged from employment, applied for unemployment insurance benefits under the California Unemployment Insurance Program. Appellees were given an eligibility interview at which the employer did not appear, although such an appearance was permitted. As a result of that interview both employees were ruled eligible for benefits. Payments began immediately. In each case the former employer filed an appeal after learning of the grant of benefits, contending that benefits should be denied because the claimants were discharged for cause. In accordance with the practice of the agency and pursuant to § 1335 of the California Unemployment Insurance Code[1] payments automatically stopped. At the subsequent hearings before an Appeals Board Referee, which stage is essentially an appeal from the preliminary determination under

---

[1] Section 1335 of the California Unemployment Insurance Code provides:

*"If an appeal is filed, benefits with respect to the period prior to the final decision on the appeal shall be paid only after such decision,* except that:

"(a) If benefits for any week are payable in accordance with a determination by the department irrespective of any decision on the issues set forth in the appeal, such benefits shall be promptly paid regardless of such appeal, or

"(b) If a referee affirms a determination allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken, and regardless of any action taken under Section 1336 or otherwise by the director, Appeals Board, or other administrative body or by any court.

"If such determination is finally reversed, no employer's account shall be charged with benefits paid because of that determination." (Emphasis added.)

California Unemployment Insurance Code §§ 1328, 1334, appellee Hudson's eligibility was affirmed, but appellee Java was ruled ineligible and the initial determination was reversed.

Prior to the hearings before the Referee, appellees commenced a class action in the United States District Court on behalf of themselves and other claimants similarly situated. They sought a declaration that § 1335 of the California Unemployment Insurance Code is unconstitutional and inconsistent with the requirements of § 303 (a)(1) of the Social Security Act, and an order enjoining the operation of § 1335.

A three-judge court was convened, and it concluded that § 1335 is defective on both constitutional and statutory grounds. The District Court held that by not providing for a pretermination hearing, the California procedure constitutes a denial of procedural due process, relying on *Goldberg* v. *Kelly*, 397 U. S. 254 (1970). It further held that the application of § 1335, so as to result in a median seven-week delay in payments to claimants who have been found eligible for benefits, constituted a failure to pay unemployment compensation "when due" within the meaning of § 303 (a)(1) of the Social Security Act. The court granted appellees' motion for a preliminary injunction, ordering the State of California not to suspend unemployment benefits pursuant to § 1335 because an eligibility determination has been appealed.

### (1)

We agree with the conclusion of the District Court that § 1335 of the California Unemployment Insurance Code conflicts with the requirements of § 303 (a)(1) of the Social Security Act. This holding makes it unnecessary to reach the constitutional issue involved in *Goldberg* v. *Kelly, supra,* on which the District Court relied.

## (2)

The importance of this case to workers is obvious. Because an understanding and the resolution of the basic issue depends on familiarity with a series of detailed procedures, we set out fully the administrative scheme.

All federal-state cooperative unemployment insurance programs are financed in part by grants from the United States pursuant to the Social Security Act, 42 U. S. C. §§ 501–503. No grant may be made to a State for a fiscal year unless the Secretary of Labor certifies the amount to be paid, 42 U. S. C. § 502 (a). The Secretary of Labor may not certify payment of federal funds unless he first finds that the State's program conforms to federal requirements. In particular, § 303 (a)(1) of the Act requires that state methods of administration be found "to be reasonably calculated to insure full payment of unemployment compensation when due." [2]

The California Unemployment Insurance Compensation Program, certified by the Secretary of Labor under § 303 of the Act, provides for payment of insurance benefits, over an extended period of time, to persons who find themselves unemployed through no fault of

---

[2] Section 303 (a)(1) of the Social Security Act, 42 U. S. C. § 503 (a)(1), provides in part:

"(a) The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for—

"(1) Such methods of administration (including after January 1, 1940, methods relating to the establishment and maintenance of personnel standards on a merit basis, except that the Secretary of Labor shall exercise no authority with respect to the selection, tenure of office, and compensation of any individual employed in accordance with such methods) as are found by the Secretary of Labor to be *reasonably calculated to insure full payment of unemployment compensation when due.*" (Emphasis added.)

their own. Cal. Unemp. Ins. Code § 1251 *et seq.* In order to be eligible for benefits a claimant is required to have earned a specified amount of wages during his base period. *Id.,* §1281. Benefits are paid from the State Unemployment Fund, which consists of funds collected from private employers, *id.,* § 976 *et seq.,* and money credited to the State's account in the federal Unemployment Trust Fund pursuant to 42 U. S. C. §§ 501–503, 1101–1105. The amount of money an employer is required to pay into the State Fund is based on benefits paid to terminated employees which are charged to its reserve account and disbursements from the State Unemployment Fund. Cal. Unemp. Ins. Code §§ 1025–1032, 976–978.

A claimant, appearing at an unemployment insurance office to assert a claim initially is asked to fill out forms which, taken together, indicate the basis of the claim, the name of the claimant's previous employer, the reason for his unemployment, his work experience, etc. The claimant is asked to return to the office three weeks later for the purpose of receiving an Eligibility Benefits Rights Interview. The issue most frequently disputed, the claimant's reason for termination of employment, is answered on Form DE 1101, and the Department immediately sends copies of this form to the affected employer for verification. Meanwhile the employer is asked to furnish, within 10 days, "any facts then known which may affect the claimant's eligibility for benefits." Cal. Unemp. Ins. Code §§ 1327, 1030. If the employer challenges eligibility, the claimant may then be asked to complete Form DE 4935, which asks for detailed information about the termination of claimant's previous job. The interviewer has, according to the Local Office Manual (L. O. M.) used in California, the "responsibility to seek from any source the facts required to make a prompt and proper determination of eligibility." L. O. M.

§ 1400.3 (2). "Whenever information submitted is not clearly adequate to substantiate a decision, the Department has an obligation to seek the necessary information." L. O. M. § 1400.5 (1)(a). This clearly contemplates inquiry to the latest employer, among others.

The claimant then appears for his interview. At the interview, the eligibility interviewer reviews available documents, makes certain that required forms have been completed, and clarifies or verifies any questionable statements. If there are inconsistent facts or questions as to eligibility, the claimant is asked to explain and offer his version of the facts. The interviewer is instructed to make telephone contact with other parties, including the latest employer, at the time of the interview, if possible. L. O. M. § 1404.4 (20). Interested persons, including the employer, are allowed to confirm, contradict, explain, or present any relevant evidence. L. O. M. § 1404.4 (21).

The eligibility interviewer must then consider all the evidence and make a determination as to eligibility. Normally, the determination is made at the conclusion of the interview. L. O. M. § 1404.6 (2). However, if necessary to obtain information by mail from any source, the determination may be placed in suspense for 10 days after the date of interview, or, if no response is received, no later than claimant's next report day. L. O. M. § 1400.3 (2) (a).

From the foregoing it can be seen that the interview for the determination of eligibility is the critical point in the California procedure.[3] In the Department's own terms, it is "the point at which any issue affecting the claimant's eligibility is decided and fulfills the Department's legal obligation to insure that . . . [b]enefits

---

[3] Of the 226,066 claimants ruled ineligible in 1968, only 2,602 (1%) were found ineligible by a state referee upon an employer's appeal.

*are paid promptly if claimant is eligible.*" L. O. M.
§ 1400.1 (1) (emphasis added). If the initial determination is favorable to the claimant,[4] payments begin immediately, and for 95–98% of the claims, former employers do not appear or seek a hearing;[5] no further problem arises as to initial eligibility. The Department sends out a notice to the employer informing him that the claimant has been found eligible, and that the employer may appeal within 10 days. Cal. Unemp. Ins. Code § 1328. The 10-day period may be extended for "good cause." *Ibid.*

If the employer appeals, payment of the claimant's benefits is stopped pending determination on appeal before an Appeals Board Referee. *Id.,* § 1335; see L. O. M. § 1474. The automatic suspension of benefits upon the employer's appeal, after an initial determination of eligibility, is the aspect of the California procedure challenged here. By that time the claimant may have received one or perhaps two payments. When the employer appeals, a hearing is then scheduled at which both the parties may appear and be represented, call witnesses, and present evidence. "A referee after affording a reasonable opportunity for fair hearing, shall, unless such appeal is withdrawn, affirm, reverse, or modify any determination which is appealed . . . ." Cal. Unemp. Ins. Code § 1334. The appeal affords a *de novo* consideration. Generally, processing of the employer's appeal takes between six and seven weeks, between the date of filing the appeal and the date of mailing the decision or dismissal.[6]

If upon appeal the Referee finds the claimant eligible,

---

[4] Of 667,993 determinations on eligibility in 1968, 441,927 were favorable to the claimant.

[5] In 1968 there were only 5,526 decisions on appeals filed by employers.

[6] In 1968 the period was 49 days; in 1969 it was 40.5 days.

payments are reinstated at once and continue even if the employer exercises his right to appeal further to the Appeals Board. Cal. Unemp. Ins. Code § 1335 (b). Meanwhile as much as seven to 10 weeks may have elapsed. The record indicates that employers are successful in less than 50% of their appeals from initial determinations of eligibility.[7] The Referee's decision is final unless within 10 days further appeal is initiated to the Appeals Board. Cal. Unemp. Ins. Code §§ 1334, 1336. The Appeals Board must render a decision within 60 days after the filing of an appeal to it, unless it requires the taking of further evidence. *Id.*, § 1337. If the claimant is successful on appeal, he receives a lump sum payment for weeks of unemployment prior to the Referee's decision. *Id.*, § 1338. If the employer is successful on appeal, his reserve account is immediately credited with all monies that have been paid his former employee. He has no responsibility for recoupment. *Id.*, §§ 1335, 1380.[8]

(3)

The dispositive issue is the determination of whether § 1335 of the California Unemployment Insurance Code violates the command of 42 U. S. C. § 503 (a)(1) that state unemployment compensation programs must "be

---

[7] Of 4,159 appeals filed by an employer between January 1, 1969, and September 30, 1969, 2,023 resulted in decisions favorable to the employer. (During the same period there were 14,768 appeals filed by claimants, 4,838 of which were successful.) In 1968 there were 5,526 decisions on appeals filed by employers, resulting in 2,602 decisions favorable to the employer, and 2,924 favorable to the claimant.

[8] Counsel informed the Court that recoupment is effected by the Department as to approximately 65% of the amounts erroneously paid; this is generally accomplished by way of offset against benefits subsequently granted in a later unemployment claim. The Department may also file a civil action for recovery. See Cal. Unemp. Ins. Code § 2739.

reasonably calculated to insure full payment of unemployment compensation when due." The purpose of the federal statutory scheme must be examined in order to reconcile the apparent conflict between the provision of the California statute and § 303 (a)(1) of the Social Security Act.

It is true, as appellants argue, that the unemployment compensation insurance program was not based on need in the sense underlying the various welfare programs that had their genesis in the same period of economic stress a generation ago. A kind of "need" is present in the statutory scheme for insurance, however, to the extent that any "salary replacement" insurance fulfills a need caused by lost employment. The objective of Congress was to provide a substitute for wages lost during a period of unemployment not the fault of the employee. Probably no program could be devised to make insurance payments available precisely on the nearest payday following the termination, but to the extent that this was administratively feasible this must be regarded as what Congress was trying to accomplish. The circumstances surrounding the enactment of the statute confirm this.

The Social Security Act received its impetus from the Report of the Committee on Economic Security,[9] which was established by executive order of President Franklin D. Roosevelt to study the whole problem of financial insecurity due to unemployment, old age, disability, and health. In its report, transmitted to Congress by the President on January 17, 1935, the Committee recommended a program of unemployment insurance compen-

---

[9] Report of the Committee on Economic Security, Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 1311 (1935); see generally Larson & Murray, The Development of Unemployment Insurance in the United States, 8 Vand. L. Rev. 181 (1955); Witte, Development of Unemployment Compensation, 55 Yale L. J. 21, 29–34 (1945).

sation as a "first line of defense for . . . [a worker] ordinarily steadily employed . . . for a limited period during which there is expectation that he will soon be reemployed. This should be a contractual right not dependent on any means test. . . . It will carry workers over most, if not all, periods of unemployment in normal times without resort to any other form of assistance."[10] Estimates of possible amounts and duration of unemployment benefits were made by the actuarial staff of the Committee. On the basis of 1922–1933 statistics, it was estimated that 12 weeks of benefits could be paid with a two-week waiting period at a 4% employer contribution rate.[11] The longest waiting period entering into the estimates was four weeks, indicating an intent that payments should begin promptly after the expiration of a short waiting period.

Other evidence in the legislative history of the Act and the commentary upon it supports the conclusion that "when due" was intended to mean at the earliest stage of unemployment that such payments were administratively feasible after giving both the worker and the employer an opportunity to be heard. The purpose of the Act was to give prompt if only partial replacement of wages to the unemployed, to enable workers "to tide themselves over, until they get back to their old work or find other employment, without having to resort to relief."[12] Unemployment benefits provide cash to a newly unemployed worker "at a time when otherwise he would have nothing to spend,"[13] serving to maintain the

[10] Report of the Committee on Economic Security, *supra,* n. 9, at 1321–1322. See Note, Charity versus Social Insurance in Unemployment Compensation Laws, 73 Yale L. J. 357 (1963).

[11] Hearings, *supra,* n. 9, at 1321, 1319.

[12] H. R. Rep. No. 615, 74th Cong., 1st Sess., 7 (1935).

[13] Statement of the Secretary of Labor, Hearings, *supra,* n. 9, at 119. Cf. *Nash* v. *Florida Industrial Comm'n,* 389 U. S. 235, 239 (1967).

recipient at subsistence levels without the necessity of his turning to welfare or private charity. Further, providing for "security during the period following unemployment" [14] was thought to be a means of assisting a worker to find substantially equivalent employment. The Federal Relief Administrator testified that the Act "covers a great many thousands of people who are thrown out of work suddenly. It is essential that they be permitted to look for a job. They should not be doing anything else but looking for a job." [15] Finally, Congress viewed unemployment insurance payments as a means of exerting an influence upon the stabilization of industry. "Their only distinguishing feature is that they will be specially earmarked for the use of the unemployed at the very times when it is best for business that they should be so used." [16] Early payment of insurance benefits serves to prevent a decline in the purchasing power of the unemployed, which in turn serves to aid industries producing goods and services. The following extract from the testimony of the Secretary of Labor, in support of the Act, describes the stabilization mechanism contemplated:

> "I think that the importance of providing purchasing power for these people, even though temporary, is of very great significance in the beginning of a depression. I really believe that putting purchasing power in the form of unemployment-insurance benefits in the hands of the people at the moment when the depression begins and when the first groups begin to be laid off is bound to have a beneficial effect.

---

[14] See S. Rep. No. 628, 74th Cong., 1st Sess., 12 (1935).

[15] Statement of Federal Relief Administrator and Member of the Committee on Economic Security, Hearings on H. R. 4120 before the House Committee on Ways and Means, 74th Cong., 1st Sess., 214 (1935).

[16] Statement of Sen. Robert F. Wagner, Hearings, *supra*, n. 9, at 3.

> Not only will you stabilize their purchases, but through stabilization of their purchases you will keep other industries from going downward, and immediately you spread work by that very device." [17]

We conclude that the word "due" in § 303 (a)(1), when construed in light of the purposes of the Act, means the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; any other construction would fail to meet the objective of early substitute compensation during unemployment. Paying compensation to an unemployed worker promptly after an initial determination of eligibility accomplishes the congressional purposes of avoiding resort to welfare and stabilizing consumer demands; delaying compensation until months have elapsed defeats these purposes. It seems clear therefore that the California procedure, which suspends payments for a median period of seven weeks pending appeal, after an initial determination of eligibility has been made, is not "reasonably calculated to insure full payment of unemployment compensation when due." [18]

## (4)

We are not persuaded by appellants' suggestion that the initial determination is clouded with sufficient uncertainty as to warrant withholding benefits until the appeal is decided to protect the interests of the State or of employers. The California procedure for initial determinations is effective in insuring that benefits are limited to legally eligible claimants. From 95%–98% of ineligible

---

[17] Statement of the Secretary of Labor, Hearings, *supra*, n. 15, at 182. See Clague, The Economics of Unemployment Compensation, 55 Yale L. J. 53, 69 (1945).

[18] It was uncontested in argument before the District Court that the average period of unemployment in California is approximately nine weeks.

134

claimants are screened out at this stage. The primary inquiry at the preliminary interview is to examine the claimant's basic eligibility under the California statute. It is an occasion when the claims of both the employer and the employee can be heard, however. The regulations contemplate that the interviewer shall make inquiries of the employer informally. This may not always flush out objections based on discharge for cause, as this case illustrates. Nonetheless, if the employer has notice of the time and place of the preliminary interview, as was the case here, it is his responsibility to present sufficient data to make clear his objections to the claim for benefits and put the interviewer in a position to broaden the inquiry if necessary. Any procedure or regulation that fails to give notice to the employer would, of course, be violative of the statutory scheme as we construe it.

Although the eligibility interview is informal and does not contemplate taking evidence in the traditional judicial sense, it has adversary characteristics and the minimum obligation of an employer is to inform the interviewer and the claimant of any disqualifying factors. So informed, the interviewer can direct the initial inquiry to identifying a frivolous or dilatory contention by either party.

It would frustrate one of the Act's basic purposes—providing a "substitute" for wages—to permit an employer to ignore the initial interview or fail to assert and document a claimed defense, and then effectuate cessation of payments by asserting a defense to the claim by way of appeal. If the employer fails to present any evidence, he has in effect defaulted, and neither he nor the State can with justification complain if, on a *prima facie* showing, benefits are allowed. If the employer's defenses are not accepted and the claim is allowed, that also constitutes a determination that the benefits are "due."

As we have noted, this construction of the statutory scheme vindicates the congressional objective; California's approach tends to frustrate it. Our reading of the statute imposes no hardship on either the State or the employer [19] and gives effect to the congressional objective of getting money into the pocket of the unemployed worker at the earliest point that is administratively feasible. That is what the Unemployment Insurance program was all about.

For the reasons stated enforcement of § 1335 must be enjoined because it is inconsistent with § 303 (a)(1) of the Social Security Act. See *King* v. *Smith*, 392 U. S. 309, 333 (1968); *Rosado* v. *Wyman*, 397 U. S. 397, 420–421 (1970).

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

While I agree with the opinion of the Court, I add a few words.

The argument of California in this case is surprisingly disingenuous. First it seeks to distinguish *Goldberg* v. *Kelly*, 397 U. S. 254, on the ground that "welfare is based on need; unemployment insurance is not." But that simply is not true, for the history makes clear that the thrust of the scheme for unemployment benefits was to take care of the need of displaced workers, pending a search for other employment. Second, California argues that delay in payment of benefits until the employer's appeal is ended is necessary in terms of due process because "it is

---

[19] For example, an employer's reserve account is not charged if a claimant is ruled ineligible because of voluntary termination or discharge for cause, unless the employer fails to furnish the information required. Cal. Unemp. Ins. Code §§ 1032, 1030.

In disposing of the prayer for a permanent injunction, it may be appropriate to join the Secretary of Labor as a party in order that complete relief may be accorded.

the employer's money which is used to pay the claimant," his account being "charged" and his experience rating "adversely affected" each time an employee is paid benefits. It is true that the amount of taxes contributed by each employer to the unemployment fund varies directly with the number of his former employees who qualify for unemployment benefits. Under the California scheme, however, an employer's account is not finally charged with benefit payments until after he has exhausted all appeals in the administrative chain and also obtained judicial review. If he wins at any appellate level, he is *not* charged with any benefits paid to his former employee pending his appeal. Cal. Unemp. Ins. Code §§ 1335, 1380. He has *no* responsibility for recoupment. Thus, regardless of whether benefits to his former employees are suspended pending his appeal, an employer is assured of a complete opportunity to be heard *before* effective action is taken against him.

Therefore here, as in *Goldberg,* the requirements of procedural due process protect the payment of benefits owing the displaced employee and the employer has notice and hearing before his account is charged.

Whether due process would require the latter is a question we do not reach.*

---

*Cf. *Labor Board* v. *Gullett Gin Co.,* 340 U. S. 361. Though that case involved a question whether the Labor Board must deduct unemployment insurance payments from back-pay awards, we said:

"Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, *the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state.*" *Id.,* at 364. (Italics added.)