Dear Mr. Scott:
This opinion is in reply to your request concerning some of the changes that Act 1050 of the 1991 Regular Session has made in the Louisiana unemployment compensation scheme with respect to temporary service employees and the validity of those changes in light of federal requirements.
Specifically you show:
That Act enacted, inter alia, R.S. 23:1600 (3)(b)(iv) of the Employment Security law which provides:
 "(iv) For the purpose of this Section and notwithstanding any other provisions of this Chapter, a claimant who is an employee of a temporary service employer shall have satisfied the requirements of making an active search for work and be eligible to receive benefits if he can demonstrate to the administrator that he has contacted his temporary service employer for a new assignment each day during regular business hours and has been offered no new assignment by such employer within ten regular working days and has accepted no other employment. The claimant shall maintain a telephone logbook provided to him by his temporary service employer for the purpose of recording his contracts for assignment. When the temporary service employer gives the claimant a telephone logbook, he shall also provide a written explanation of the following search-for-work procedures. The claimant must provide the temporary service employer a telephone number where he may be reached for assignments. When the claimant has not been contacted by his temporary service employer with an assignment on a given day, he shall contact such employer for an assignment during regular business hours. If the claimant contacts his temporary service employer and no assignment is made, the claimant shall provide a code number by such temporary service employer. The claimant shall enter that code number along with the date in his telephone logbook after his last assignment, the claimant shall be eligible to receive benefits dating from the first day he had no assignment. . . ."
R.S. 23:1600 (3)(b)(iv) seems to differ from the usual conditions previously considered fundamental to the concept of unemployment compensation as expressed by 23:1600 (1)(2) and (3)(a), which provide:
 "An unemployed individual shall be eligible to receive benefits only if the administrator finds that:
 "(1) He had made a claim for benefits in accordance with the provisions of R.S. 23:1621 and R.S. 23:1622.
 "(2) He has registered for work at, and thereafter has continued to report at, and employment office in accordance with such regulations as the administrator may prescribe. The administrator may, by regulation, waive or alter either or both of the requirements of this Section as to such types of cases or situations with respect to which he finds that compliance with such requirements would be oppressive, or would be inconsistent with the purposes of this Chapter; but no such regulation shall conflict with R.S. 23:1591.
 "(3)(a) He is able to work, available for work, and is conducting an active search for work. . . ."
You posit that R.S. 23:1600 (3)(b)(iv) differentiates from unemployed workers (claimants) generally those who happen to be hired by a temporary service employer and are subsequently unemployed. The requirements for eligibility imposed on ex-employees of temporary service employers, you point out, are requirements that seem to create a classification scheme under which persons similarly situated receive unequal treatment. You further mention the apparent conflict between the fundamental concept of "unemployment" as expressed in the first sentence of the older part of the definition contained in R.S.23:1472(19)(a) and the new concept of termination of a temporary service employment relationship as expressed in R.S. 23:1472
(12)(K) enacted by Act 1050 of the 1991 Regular Session. The fundamental idea of "unemployment" in the unemployment compensation statutory scheme is expressed by R.S.23:1472(19)(a) as follows:
 "(19)(a) "Unemployment" — Any individual shall be deemed to be "unemployed" in any week during which he performs no services and with respect to which no wages are payable to him, or in any week of less than full-time work if the wages payable to him with respect to such week are less than his weekly benefit amount."
The new concept of termination of a temporary service employment relationship is expressed in R.S. 23:1472(12)(K) as follows:
 "K. Employment with a temporary service employer is characterized by limited term assignments of an employee to a client company or companies. Completion of such an assignment by an employee of a temporary service employer does not, in itself, terminate their employment relationship; however, said relationship shall be considered terminated when either party acts to separate himself from the other."
(Added by Acts 1991, No. 1050 § 1, eff. July 29, 1991)
When R.S. 23:1472 (12)(K) is read together with R.S. 23:1600
(3)(b)(iv), it would appear that a temporary service employer could indefinitely block an employee from obtaining unemployment compensation benefits by unilaterally declining to assign him to any client companies for any work over nine-day periods but assigning him some small amount of work on every tenth day, while all other employees seem to become immediately eligible for benefits upon loss of actual work and wages, if, despite seeking work, they have no work for merely a period of one week. See R.S. 23:1472(12)(K) and 1600(4). And because his voluntarily terminating the employment relationship would, in all likelihood, disqualify such employee from these benefits under the law, a temporary service employee becomes helpless to correct this anomaly against an unscrupulous temporary service employer.
Generally, Amendment Fourteen to the U.S. Constitution and Article I, Section 3, of the Louisiana Constitution (1974) provide that every person is entitled to equal protection of the laws of a state. In this regard, there would appear to be available a substantial argument that, because of the peculiar nature of the temporary service employment relationship, temporary service employees are not similarly situated as other employees generally and can be treated uniquely in accordance with this peculiar situation. However, in our opinion, a state or federal court would, in a future case or controversy before it, be more likely to hold that, for purposes of achieving the legitimate governmental objectives of the unemployment compensation laws, the theoretical difference in the concept of temporary service employment cannot justify denial to temporary service employees the same benefits due other employees generally in the same circumstances regarding lack of opportunity for actual work and actual wages and would, accordingly, declare unconstitutional pertinent provisions enacted by Act 1050 of the 1991 Regular Session which thus restrict the unemployment compensation rights of temporary service employees.
Nevertheless, Act 1050 of the 1991 Regular Session is not so "manifest[ly] unconstitutional," Meredith v. Fair, 305 F.2d 343,353 (U.S. App. 5th Cir. 1962), that any claim of its constitutional validity is "wholly insubstantial, legally speaking non-existent," Bailey v. Patterson, 369 U.S. 31, 33,82 S.Ct. 549, 7 L.Ed.2d 512, 514 (1962), and "foreclosed as a litigable issue," id. Therefore, until such a future adjudication would take place, this legislation must be presumed to be constitutional and must be respected and obeyed. Wall v. Close, 201 La. 986, 10 So.2d 779 (La. 1943); State v. Bd. of Sup'rs, L.S.U. and A. M. College, 228 La. 951, 84 So.2d 597
(La. 1956); Castille v. Evangeline Par. Schl. Bd., 304 So.2d 701
(La.App. 3rd Cir. 1974) writ den. 309 So.2d 342. Consequently, in advising you concerning the law, this Attorney General's opinion will not and cannot direct you to disregard or to disobey a presumptively valid law, even if it were to agree with your prediction that a court would declare it unconstitutional in a future case that might come before it.
Curative legislation, however, would seem an appropriate choice of action. In this regard, it must be emphasized that the overall unemployment compensation program is a federal program in which the state participates. Article VI, clause 2, of the U.S. Constitution makes the congressional enactments establishing and governing this program "the supreme Law of the Land." Thus, state unemployment compensation statutes and policies which conflict with valid federal laws and regulations governing unemployment compensation are in violation of the U.S. Constitution and place the state in severe jeopardy of incurring federal penalties, if not corrected to the satisfaction of the federal government. The U.S. Department of Labor is the agency vested by the federal government with the administration and enforcement of federal law and policy on unemployment compensation. You have provided us with a letter dated January 3, 1992, from the U.S. Department of Labor. Although it uses the terms issue (as in "an issue exists" or "an issue is created") and concern (as in the federal agency's "expressing concern") instead of terms such as formal objection, non-compliance, or non-conformity, the import of the letter seems clear that if Louisiana would continue to follow certain provisions of Act 1050 of the 1991 Regular Session, the U.S. Department of Labor, in all probability, would eventually make a formal determination that Louisiana is not in conformity with federal law and policy on unemployment compensation and would then institute formal proceedings. The U.S. Department of Labor letter, for example, states:
 "Section 303(a)(1) of the Social Security Act (SSA) requires, as a condition of States receiving grants for the administration of their unemployment insurance (UI) law, that State law provides for:
 [s]uch methods of administration . . . as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due. [Emphasis added.]
 "* * * The section requires `methods of administration' found by the Secretary of Labor to insure full payment when due. To this end, the Secretary has found many `methods of administration' to be necessary. See, for example, 20 C.F.R. § 602.11(a) which interprets Section 303(a)(1) to require State law to provide for such methods of administration as will reasonably ensure the `collection and handling of income for the State unemployment fund (particularly taxes and reimbursements) with the greatest accuracy feasible' and 20 CFR 602.11(d) which requires the establishment of a Quality Control program. The provision has also been interpreted to require that claimants have such contact with the State agency as to assure the claimant is able and available for work (Employment Security Manual (ESM), Part V, Section 5000.B.2.a.), that the State agency takes the initiative in obtaining information necessary for determining eligibility (ESM, Section 6013.A.1) and that the State agency has methods of administration which detect benefits paid through error and deter claimants from obtaining benefits through willful misrepresentation (ESM, Section 7511).
 "Section 303(a)(1), SSA, is applicable whenever a State establishes an administrative requirement which potentially affects a claimant's eligibility. Plainly, any method of administration which would make it so difficult to claim compensation that many claimants would not or could not file would create an issue. Similarly, an issue is created under Section 303(a)(1) whenever a provision of State law improperly places any part of the administration of eligibility criteria in the hands of an interested party (the employer) who stands to benefit through reduced experience rates whenever the claimant is denied compensation.
 "The procedures created by Act 1050 actively involve the employer in determining the claimant's eligibility. * * * [T]he claimant is provided a code book and codes by the employer. Although the eligibility determination may be issued by the State agency, the employer has undue influence on that determination. The employer could, for example, provide an erroneous code, refuse to answer the phone and then claim the claimant did not call, or allege that a properly supplied code did not agree with the employer's record of what code was given out. The claimant is thereby put in the position of contesting a procedure which is, by its very nature, almost entirely controlled by the employer. The employer's records which may be introduced to support the employer's contention, could be kept solely for the purpose of disqualifying an eligible individual. This active involvement of the employer creates issues under Section 303(a)(1).
 "In our memorandum of July 11, we expressed concern that the employer could manipulate the claimant's employment in such a way that the claimant could be prohibited from ever receiving benefits. We did not, at that time, raise an issue. We now believe an issue under Section 303(a)(1) exists because State law does not contain `methods of administration' which prohibit employer manipulation of eligibility of the individual by arranging work schedules in such a way that benefits could never be collected. In fact, the claimant who has worked for a temporary help employer who manipulates the system may never receive benefits until quitting and this quit would likely result in a disqualification. We do not believe that an unemployment insurance law which contains a provision so subject to manipulation is framed to protect those who are, in fact, unemployed through no fault of their own."
You kindly cited to us the case of California Department of Human Resources Development v. Java, 402 U.S. 121,91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), and we agree that this case pertinently illustrates the supremacy of federal law and policy over state law and procedure in this area. This case concerned a California procedure wherein a formal interview was conducted with the unemployed claimant, using completed forms designed to determine eligibility. The latest employer was given ample notice of this proceeding and allowed to confirm, contradict, explain, or present any relevant evidence. This first proceeding determined eligibility, and if the claimant was found to be eligible, he began to receive unemployment compensation benefits. However, if the employer appealed, the payments were, upon the fact of the appeal alone, stopped pending the outcome of the appeal. The U.S. Supreme Court enjoined enforcement of this California procedure because it tended to frustrate the congressional objective of getting money into the pocket of the unemployed worker at the earliest point administratively feasible and was violative of the federal statutory requirement that state unemployment compensation be reasonably calculated to insure full payment "when due."
We recognize the important social and economic contributions made by temporary service employers, especially in a recession-plagued economy with high unemployment and the lack of sufficient numbers of full-time, permanent jobs. These employers help to furnish needed labor to client companies, each of which may have substantial, but only sporadic, work to be done in order to earn enough income to stay healthy but which, taken all together, can provide, in total sum, a meaningful employment opportunity for temporary service workers. And, of course, temporary service employers provide employment opportunities to workers who might otherwise be unemployed altogether. Nevertheless, in attempting to aid and accommodate such contributory institutions, the state simply cannot violate constitutional equal protection provisions nor frustrate the congressional objectives of this federal unemployment compensation program but rather must find another, valid way of helping such employers.
Because the U.S. Department of Labor has given notice thus far only by identifying "issues exist[ing]," instead of instituting formal proceedings, Louisiana appears to have a little time within which to bring its unemployment compensation law back into conformity with federal law and policy to the enforcement satisfaction of the U.S. Department of Labor. Hence, the upcoming legislative session appears to present a seasonable opportunity for the introduction and passage of curative legislation in this regard.
Trusting this opinion has adequately responded to the scope of your request, we remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: THOMAS S. HALLIGAN Assistant Attorney General
TSH:0694