Cratsley, J.
INTRODUCTION
Part I. Background
On July 24, 1997 this Court heard this matter on stipulated facts and took it under advisement following a jury waived trial. The plaintiffs, Ellen Dicerbo et al., make four claims against the defendant Nils Nordberg, both individually and as the Commissioner of the Department of Employment Training (DET).[1] First, plaintiffs claim that DET’s consistency policy that examiners are bound by DET’s subregulatory legal interpretations violates state and federal law and constitutions. Second, plaintiffs state that DETs failure to acknowledge Board of Review and District Court decisions as binding results in irrationally inconsistent outcomes for similarly situated litigants and, therefore, is unlawful. Third, plaintiffs allege that because DET requires that review examiners follow agency subregulations resulting in the agency failing to follow differing legal interpretations of the Board of Review and District Courts, the DET violates the “when due” requirement of federal unemployment law. And fourth, plaintiffs argue that, as a matter of law, DET’s denial of benefits to TFSO[2] claimants is erroneous under the Bolta decision of the Supreme Judicial Court and the White decision of the Appeals Court. As a result of this fourth claim, plaintiffs’ argue that DET should be ordered to award appropriate unemployment benefits to those TFSO claimants who were denied them.
The defendant denies the legal validity of all plaintiffs’ claims.
For the reasons stated herein, the plaintiffs’ claims are accepted in part and rejected in part.
Part II. Summary of the Stipulated Facts (see "Stipulation of Agreed-Upon Facts”)
When an individual is separated from employment and files a claim for unemployment benefits, the DET requests information from the employer concerning the circumstances of the separation. G.L.c. 151A, §§38, 39. If the employer’s response raises a question concerning the claimant’s eligibility for benefits, a Service Representative of the DET interviews both the claimant and a representative of the employer, and then issues a written determination as to the claimant’s eligibility. G.L.c. 151A, §39(a). Stipulated Facts ¶1.
*161 A party who flies a timely appeal of an adverse determination by DET is entitled to an adjudicatory hearing before the Deputy Director of DET or the Deputy Director’s designee, called a Review Examiner (“Examiner”). See G.L.c. 151A, §39(b) and c. 30A, and the hearing regulations which apply to DET, 801 C.M.R. 1.02 and.03 (Standard Rules of Adjudicatory Procedure Informal/Fair Hearings). Stipulated Facts ¶2.
Any party aggrieved by the decision of the Deputy Director or his designee may appeal to the Board of Review, G.L. 151A, §§40, 41, a three-member panel within the DET which reviews the hearing decisions, but is independent of DET’s control. The Board has discretion within the parameters of G.L.c. 151A, §41 to accept or deny an appeal. The Deputy Director or any party aggrieved by a decision of the Board of Review (including instances in which the Board has denied the application for further review) may appeal to District Court. G.L.c. 151A, §42. Any party aggrieved by a decision of a District Court in an unemployment benefits case may appeal to the Appeals Court. G.L.c. 151A, §42. Stipulated Facts 13.
Since November 1992 the Determinations Department and the Hearings Department, whose Review Examiners conduct adjudicatory hearings on appeals from determinations of Service Representatives, have been consolidated under the direction of the Director of Determinations and Hearings. Stipulated Facts 22.
Deputy Director Nordberg’s consistency policy is that legal interpretations should be made within and between the Hearings and Determinations Departments on consistent bases if cases present no material differences in the applicable facts. Stipulated Facts 125. Therefore, Examiners are bound by;
a) the Deputy Director’s subregulatory legal interpretations, even if an Examiner in an individual case does not believe that the Deputy Director’s interpretation is in accordance with applicable law;
b) the conclusions and interpretations contained in Determinations Department memoranda on issues such as mass layoffs, unless the facts presented at the hearing are different;
c) legal interpretations found in the Service Representative Handbook;
d) legal interpretations found in Local Office Bulletins (memoranda distributed by DET for the guidance of Service Representatives and Examiners to clarify an issue); and
e) legal interpretations contained in other written DET memoranda. Stipulated Facts 127.
If the Examiner concludes that a subregulatory legal interpretation contained in any of the documents listed above is not in accordance with the law applicable to a pending case, the Examiner is ultimately bound by the Deputy Director’s interpretation. Stipulated Facts 128.
DET takes the position that Board of Review and District Court decisions which reach different legal conclusions than preexisting subregulatory legal interpretations of DET are not binding on DET, except as they affect the particular parties to the cases in which the decisions are made. DET reviews Board of Review and District Court decisions and will change its interpretation of law if it concurs with a decision. DET, however, will continue to apply its own sub-regulatory interpretations of law if, after review, the DET’s interpretation continues to differ from that set out in a decision of the Board of Review or District Court. Stipulated Facts 129.
Also at issue in this matter is DET’s consistency policy as it pertains to a TFSO package provided to employees laid off from Digital Equipment Corp. (See n. 1.) On April 9,1991 the Determinations Department of the DET notified its local offices that the Digital TFSO package constituted a disqualifying “continuation” pay based on DET’s interpretation of Itek Corp. v. Director of Division of Employment Security, 398 Mass. 682 (1986). (See Stipulated Facts 18; Appendix E.) Service Representatives thereafter consistently found Digital TFSO claimants disqualified for the number of weeks on which Digital had based their lump sum payments. Id.
In December 1991, in the case of Homer Blair v. Commissioner of Department of Employment and Training, the Westfield District Court held that the Digital TFSO lump-sum payments constituted nondisqualifying severance pay as governed by Bolta Products Div., General Tire & Rubber Co. v. Director of Division of Employment Security, 356 Mass. 684 (1970). See Stipulated Fact 19. Although DET appealed the District Court’s decision and later withdrew its appeal, the defendant continued to disqualify claimants with the same TFSO package. Id. By September 1992 the Board of Review began to issue decisions consistent with the District Court’s decision that the TFSO package was nondisqualifying severance pay as governed by Bolta. See Stipulated Facts 110. However, the DET continued to disqualify claimants in its eligibility determinations.
RULINGS OF LAW DET’S CONSISTENCY POLICY THAT REVIEW EXAMINERS ARE BOUND BY DET’S SUBREGULATORY LEGAL INTERPRETATIONS VIOLATES APPLICABLE STATE AND FEDERAL LAW.
At the heart of the plaintiffs’ claim that defendant’s consistency policy is invalid when it binds review examiners to follow DET subregulatory policy is the argument that their functional independence is limited, thus violating state and federal laws. Plaintiffs point specifically to the language of C.151A, §39(b) which requires that “all interested parties [shall be afforded] a reasonable opportunity for a fair hearing before an impartial hearing officer.” (Emphasis added.) *162 See also 42 U.S.C. §503(a)(3) (requires that a state provide an “[o]pportunity for a fair hearing before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied”).
The plaintiffs also look for guidance from our Supreme Judicial Court and point to language from Director of the Division of Employment Security v. Fingerman, 378 Mass. 461 (1979). In Fingerman, the SJC upheld a Board of Review decision awarding benefits, and went on to discuss the allocation of functions within the DET by stating;
if it were left to the final decision by the several review examiners, consistent application of the statute to persons similarly situated would be impaired. Application of law to fact has long been a matter entrusted to the informed judgment of the board of review.
378 Mass. at 463-64.
The plaintiffs argue, and this Court finds, that this language indicates the DET hearing officers are (and should be) independent because they would necessarily reach differing conclusions on some issues of law that the Board of Review would need to harmonize. Plaintiffs also cite to Massachusetts Ass’n of Older Ams. v. Commissioner of Insurance, 393 Mass. 404, 415 (1984), which they claim indicates that there is no subordinate and dependent role of Examiners within the DET.
From the stipulated facts and the practices they would necessarily dictate, it is clear that the Examiners are not completely impartial and independent from the DET and that the Deputy Director is, therefore, violating c. 151A, §39 and 42 U.S.C. §503(a)(3). The defendant points to the language of c. 151 A, §39 and argues that the legislature intended for Examiners to make their decisions at the direction of the Deputy Director. Throughout §39 there are references to “the commissioner or his authorized representative” who “shall promptly determine whether a claim is valid.” See also §39(b) (“The decision of the commissioner or his authorized representative shall be based solely on testimony, evidence, materials, and issues introduced at the hearing... Unless action is taken under Section forty, the decision of the commissioner or his authorized representative shall be final on all questions of fact and law”). Although this language indicates that either the deputy director or the examiner can hold the hearing and make the final decision, this Court does not find that the language also gives the Deputy Director authority to direct or dictate the decisions of the Examiner.
The language of c. 151A, §39(b) requires that the hearing officer remain “impartial.” If they are strictly bound to the subregulatory legal interpretations of the Deputy Director, the Examiners are anything but impartial when it comes to dealing with questions of law. This Court understands that the consistency policy affects a limited number of cases before the Examiners. Nevertheless, the consistency policy makes it impossible for the “authorized representative” to make decisions on all “questions of law" as required by §39.
Binding the Examiners to subregulations also runs contrary to 801 CMR 1.01 et. seq. of the Executive Office of Administration and Finance’s Standard Rules of Adjudicatory Procedure Informal/Fair Hearings (“Standard Rules”) which apply to DET hearings. Although the plaintiffs point to various violations, the most relevant is 801 CMR 1.02(10)(g) which requires a hearing officer to conduct a “fair hearing ... to reach a fair, independent, and impartial decision based upon the issues and evidence presented at the hearing in accordance with the law.” See also 801 CMR 1.02(10)(n)(2) (“The Presiding Officer’s decision must be rendered in accordance with the law . . . [which] includes the state and federal constitutions, statutes, and duly promulgated regulations, as well as decisions of the state and federal courts”). Because at all times the Examiner is bound to the subregulatory interpretation of the agency, the Examiner can not render an independent decision he feels is in “accordance with the law.”
This Court recognizes that at first glance the consistency policy sounds like “stare decisis” by which all common law legal systems desire fact-finders to reach legal conclusions consistent with appellate decisions setting forth applicable legal standards. The difference here is that the policy in question binds the fact-finder in each and every situation of a possibly different application of fact to law. There is simply too much similarity in legal outcome required by the policy to allow individual Examiners to act independently in their own decision making. This creates inconsistency with state, federal, and constitutional law.
This Court agrees with the defendants’ reading of c. 151A, §41 concerning the Board of Review which is to remain separate and independent from DET policy.[3] Although the Board of Review can provide a fair, independent, and impartial hearing, all of which are rights afforded a claimant by U.S.C. §503(a)(3) and Article 29 of the Massachusetts Constitution, the Board of Review does not always provide such a role in each and every case before it. Although the Board may itself take evidence at a hearing, the Board of Review most often remands the case back to the Deputy Director or the Examiner to take additional evidence. See c. 151A, §41 (b); Fingerman, 378 Mass. at 463. (“The 1976 amendment reduced the factfinding role of the board of review, directing the board to inquire whether the director’s decision was founded on the evidence on the record and was free from any error of law effecting substantial rights.”) Id. at 462-63. In fact, statistics show that the Board denies review to some 80% of the appeals filed. See Appendix Q. If claimants are not getting a full and fair adjudicatory hearing with the Examiner and only a limited number of appeals receive a fair hearing by the Board *163 of Review, there is an error of law by the defendants in utilizing the consistency policy.
Although not essential to this decision, there is a second legal concern for this Court. When claimants exercise their right to appeal to the Board errors of law which the Examiner made in adhering to the DET’s subregulatory legal interpretations, due process is not served because of the inevitable delay when each claimant has to make an appeal even though there may be case law or other Board of Review decisions supporting the claimant’s argument. Due process of law requires the opportunity to be heard at a meaningful time and in a meaningful manner. See Goldberg v. Kelly, 397 U.S. 254, 267 (1970). Because the DET binds the Examiners, effectively making any applicable case law moot, the claimant is forced to go through the process of appeal. As computed by the plaintiffs, it would take a minimum of 111 days to receive a favorable Board decision. Due process of law is not served when only those who have the time and resources to wait for a Board decision can obtain individual, case specific results on a question of law.
DET’S FAILURE TO ACKNOWLEDGE BOARD OF REVIEW DECISIONS WHICH REJECT LEGAL INTERPRETATIONS OF THE DET AS THEY APPLY UNIVERSALLY TO SIMILARLY SITUATED CLAIMANTS IS UNLAWFUL. ON THE OTHER HAND, DET’S POLICY OF REJECTING INDIVIDUAL DISTRICT COURT DECISIONS WHICH REJECT DET’S SUBREGULATORY LEGAL INTERPRETATIONS IS NOT UNLAWFUL AS LONG AS THE DET FOLLOWS THE DECISION AS IT APPLIES TO THE PARTICULAR CASE.
The defendant rejects any claim that the DET must follow all Board of Review and District Court decisions and thus apply them to similarly situated litigants for the precise reason that neither reviewing body has binding authority over the agency. The defendant argues that nothing in c. 151A, §41 gives the Board of Review binding authority over the Deputy Director’s policies. Rather, the defendant says that §41 only provides the Board of Review with statutory authority to review and rule on individual cases. Similarly, the defendant argues that nothing in c. 151A, §42 states that the decision of a District Court in an individual case has any broader effect on the Deputy Director or that any decision by a District Court has any binding effect beyond the single case at issue. Furthermore, G.L.c. 231A, the declaratory judgment statute, specifically excludes District Courts from among those courts which have statutory authority to “make binding declarations of right, duty, status, and other legal relations.” G.L.c. 231A, §1.
The defendant also maintains the lawfulness of his policy in regard to Board of Review and District Court decisions because of the administrative problems of consistency the DET would face having to change its policies after every Board and District Court decision.
This Court is not persuaded by the defendant’s argument regarding the Board of Review. This Court finds that the Board must be free in each decision to set new law and have that law promptly followed. Again, the Fingerman decision demonstrates the power of the Board in deciding questions of law and in allowing that body to maintain consistency in the application of the law. “Application of law to fact has long been a matter entrusted to the informed judgment of the board of review.” Fingerman, 378 Mass, at 463-64. Statutory language demonstrating the authority the Board of Review has over the Deputy Director can be found in c. 151A, §41(b) (“Unless action is taken under Section forty-two, the decision of the board shall be final on all questions of fact and law”). If the decision is contrary to the Deputy Director’s subregulatory legal interpretation, he is still empowered to appeal under c. 151A, §42.
Because this Court finds the Board of Review has binding authority over DET legal interpretations and has a lawful role to establish consistency in the application of its new decisions to subsequent cases, Board of Review decisions must be treated with precedential value. If an agency like the DET departs from its settled course after cases of a similar nature have been decided, then it is required to explain why it departs from them. See Greater Boston Television Corp. v. FCC, 444 F.2d. 841, 852 (D.C. Cir. 1970) cert denied. 403 U.S. 923 (1971); Boston Gas Co. v. Dept. of Public Utilities, 367 Mass. 92, 104 (1975).
Evidence has been presented to this Court in the stipulated facts that the DET has not treated Board of Review decisions with precedential value and is arbitrarily denying compensation benefits for persons similarly situated to others who have been found by the Board of Review to be qualified to receive compensation. On July 25, 1991, in In re McCusker, BR 45930, the Board held for the first time that an individual who was medically restricted (partially-disabling physical condition) from working more than twenty-hours per week could be “available” within the meaning of C.151A, §21(b). See Stipulated Facts ¶16; Appendix K. Before this Board’s decision, the DETs policy was to disallow unemployment for all individuals who could only work part time. See Stipulated Facts ¶18; Appendix I. Although the DET could have appealed the Board’s decision in McCusker, it chose not to do so. Stipulated Facts ¶17. However, the DET did not issue a new policy statement on part time availability until March 7, 1994. Stipulated Facts ¶18. Because the DET refused to recognize McCusker as controlling between July 1991 and March 1994, claimants similarly situated to the claimant in McCusker had to pursue an appeal through the Board to obtain the same outcome as McCusker. Claire Johnson, an unemployment claimant whose circumstances where *164 substantially similar to those of the claimant in McCusker, was originally disqualified by the DET on May 14, 1993. Stipulated Facts ¶20. It was not until February 18, 1994 that the Board of Review ruled in her favor. Id.
By not adopting the legal interpretations established by the Board, claimants who lack the resources and stamina to appeal an Examiner’s decision are permanently deprived of compensation they are entitled to receive.
This Court is not persuaded by the plaintiffs that the DET is bound to change its interpretations of law and policy according to each District Court decision from an individual case. As the defendant correctly points out, a District Court does not have the statutory authority to make a declaratory judgment. Furthermore there is nothing in the language of c. 151A, §42, and there has been no case law presented, to suggest that a District Court decision on matters of law has any binding effect other than on the single case at issue. Unlike the Board of Review which is actually a part of the DET (although its remains independent) and can maintain a consistency policy for similarly situated litigants, District Court opinions on matters of law could differ from court to court. For this reason it would be impractible for the DET to change its policies stemming from decisions by each District Court Judge. District Court opinions can always be appealed. The DET also acknowledged to this Court that it would be bound to change its policies according to appellate decisions of the Appeals or Supreme Judicial Court.
DET’S PRACTICE OF REQUIRING ITS EXAMINERS TO FOLLOW ITS SUBREGULATORY LEGAL INTERPRETATIONS AND FAILING TO FOLLOW DIFFERING LEGAL INTERPRETATIONS OF THE BOARD OF REVIEW DOES NOT VIOLATE THE “WHEN DUE” REQUIREMENT OF FEDERAL UNEMPLOYMENT LAW.
Federal law requires state unemployment insurance agencies to provide for “such methods of administration ... as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due.” See 42 U.S.C. §503(a)(l). The United States Supreme Court has interpreted the “when due” requirement to mean that “at the earliest stage of unemployment that such payments were administratively feasible after giving both the worker and employer an opportunity to be heard.” California Department of Human Resources Development v. Java, 402 U.S. 121, 131 (1970).
Although the defendant argues to the contrary, this Court finds that the “undue delay” requirement developed in Java is not limited to situations where claimants were initially found eligible for compensation and then had their compensation terminated. While some federal courts have interpreted Java in such a manner, for this Court to require proof of established eligibility before someone can show a violation of the “when due” requirement would defeat the purposes behind the requirement. See Fursari v. Steinberg, 419 U.S. 379, 388-89, n. 15 (1975) (The United States Supreme Court rejected the argument that benefits are not “due” until administratively deemed payable). “Such a definition of the ’’when do" requirement of federal law would leave little vitality to Java!‘\ Wilkinson v. Abrams, 627 F.2d 650, 661 (3rd Cir. 1980). (“The Congressional intent of requiring prompt payment ‘when due’ applies as much to a claimant who is determined eligible on appeal from an initial determination as one who was found eligible at the initial stage. The critical factor is timely payment to all eligible persons, whether their eligibility is upheld initially or only after one or more appeals.”)
Both the plaintiffs and the defendant agree that when dealing with the “when due” clause a violation of the requirement cannot be found if the DET’s practices stem from a substantive eligibility rule. The focus of this inquiry is whether DET’s consistency policy binding the Examiners to subregulatory legal interpretations is an administrative practice which is subj ect to the timeliness requirements of the “when due" clause.
The plaintiffs assert that DET’s subregulatory legal interpretation practice (their consistency policy) is an across the board administrative practice because it is one which applies to a broad category of cases. In response, the defendant claims the subregulations issued by the DET and passed on to the Examiners are merely substantive decisions regarding a certain category of cases. This Court finds that the consistency policy is more of a substantive decision-making practice rather than an administrative method subject to the “when due” requirement. The plaintiffs’ rely on Pennington v. Didrickson, 22 F.3rd 1376 (7th Cir. 1994), cert. den. 115 S.Ct. 613 (1994), and argue that DET’s subregulatory legal interpretation practices are systemic polices. However, an examination of the administrative method which caused delay in Pennington reveals that a record keeping and reporting procedure was at fault; nothing like the consistency policy at issue here. See also Jenkins v. Bowling, 691 F.2d. 1225, 1226 (1982) (postponement of determination for unemployment compensation benefits for applicants who are in legal custody or on bail for work-related felony thefts pending results of any legal proceedings was contrary to the “reasonably calculated” to ensure prompt payment language).
AS A MATTER OF LAW, DET’S DENIAL OF BENEFITS TO TFSO CLAIMANTS IS ERRONEOUS UNDER THE BOLTA DECISION OF THE SUPREME JUDICIAL COURT. HOWEVER, RETROACTIVE APPLICATION OF THIS LEGAL CONCLUSION IS NOT REQUIRED.
The plaintiffs argue that the payments received by the TFSO claimants from their employer did not con *165 stitute remuneration under G.L.c. 151A, §l(r)(3). Relying on Bolta v. Director of the Division of Employment Security, 356 Mass. 684 (1970), and Itek v. Director of the Division of Employment Security, 398 Mass. 682 (1986), plaintiffs insist that DET subregulations treating TFSO payments as disqualifying remuneration are improper.
According to Bolta, a payment to a laid-off employee which is determined to be “severance pay" is not remuneration and does not affect eligibility. “The usual attributes of severance payments are: The total amount paid was directly related to [the employee’s] years of service. It was not subject to limitation or repayment if he obtained other employment before the expiration of three months from [the employer’s] termination from his employment. He was permanently severed from his employment... with no provision for being called back or rehired. All of the benefits of his employment terminated with the possible exception of vested pension rights.’ ” White v. Commissioner of Dep’t of Employment and Training, 40 Mass.App. 249, 252-53 (1996), quoting Bolta, 356 Mass. at 689-90.
Some years later in Itek, the SJC ruled that a payment made to laid-off workers did not constitute a severance payment. Itek, 398 Mass. at 695. Instead the arrangement was held to be remuneration because it was characterized as a salary continuation plan to employees on an inactive basis. Id. Unlike the Bolta employee, Itek’s workers continued to receive a full array of benefits, there was no separation from Itek during the plan’s operation, and the payment would cease if the employee was to obtain other employment. (In Bolta, the employee was given a lump sum payment, guaranteed regardless of whether the employee obtained other work.)
Although the defendant urges this Court to find that TFSO employees fall closer to Itek, this Court finds that the package given to TFSO employees more closely resembles the severance pay criteria set forth in Bolta. Unlike Itek, where the salary would continue to be paid weekly until an employee found other employment, TFSO employees received one lump sum payment which was guaranteed regardless of the employees obtaining other work. Meeting the other criteria of severance pay described in Bolta, the TFSO agreement permanently severed the employee and relieved Digital from any obligation ofrehiring employees. As was the case in Itek, employee health, dental, and life insurance benefits did not terminate with the agreement. However, unlike Itek, in which the plan would terminate (and benefits would end) once the employee accepted other employment, the benefits provided to TFSO claimants were a type of severance since it would be provided until the end of the Benefit Extension Period. See Appendix R, §5. There is no language in the TFSO agreement specifying that employee benefits terminate if the employee finds other employment.
The plaintiffs also claim an independent basis for relief for TFSO claimants under the Court of Appeals’ 1996 decision in White, 40 Mass.App.Ct. at 249. After Chapter 33 of the Acts of 1993 changed c. 151A, § 1 (r) (3) by defining “severance pay” as disqualifying remuneration, the Appeals Court held in White that TFSO-type payments were not severance since the required releases changed the character of the payments.
Although mindful of the similarities between severance pay and Digital’s lump sum payment to the employee, we think the fact that the employee would receive nothing unless he signed the broad release of all claims sufficiently significant to remove the payment from the definition of remuneration . . . ‘[T]he written agreement between the parties demonstrates that the employer’s primacy purpose in making a lump sum payment was, as the referee found, not to provide a salary substitute to secure the employee’s economic well-being during any period of unemployment. While there is self-serving language to this effect in the agreement that was unilaterally prepared by the employer, had this been the employer’s primary purpose for the payment, it would not have been conditioned on the employees execution of the written release.’ White, 40 Mass.App.Ct. at 253, quoting Moore v. Digital Equipment Corp., 868 P.2d. 1170, 1172 (ColoApp. 1994).
Because TFSO claimants signed a materially identical agreement to the claimant in White, the plaintiffs seek retroactive relief from the denial of benefits. In determining whether a new rule is to be retroactive, the SJC looked at three factors in McIntyre v. Assocs. Financial Servs. Co. of Mass., Inc., 367 Mass. 708, 712 (1975); (“(1) whether a new principle has been established whose resolution was not clearly foreshadowed, (2) whether retroactive application will further the rule, and (3) whether inequitable results, or injustice or hardships, will be avoided by a holding of nonretroactivify.”)
This Court agrees with the defendant and finds that the principle in White was not foreshadowed in any cases presented by the plaintiffs or in any Board or District Court opinions. As a result, this Court will not retroactively apply the rule announced in White to TFSO claimants in this suit.
REQUEST FOR DRAFT JUDGMENTS
Because this Court agrees with plaintiffs on some claims and with defendant on others, all as set forth herein, the parties are requested to submit draft final judgments for this Court’s consideration. A hearing will be held on these proposals on Friday, Januaiy 30, 1998 at 9:00 a.m. in the Judges’ Lobby on the 11th floor of the New Courthouse, Boston, MA.

Since July 1,1996 the Department of Employment Training has been changed to the Division of Employment and Training (“DET”). Defendant Nordberg, previously called the *166 Commissioner of DET, is now the Deputy Director of the Division.

TFSO stands for Transitional Financial Support Option. TFSO was a package given to thousands of Digital employees between 1990 and March 1993 consisting of a lump sum payment determined by length of service and the continuation of maj or fringe benefits for a corresponding period of time. Stipulated Facts ¶7.

See c. 151A, §41(b) (where review is granted, “the board shall inquire whether the commissioner’s decision was founded on evidence in the record and was free from any error of law affecting substantial rights ... the decision of the board shall be final on all questions of fact and law”); §41(d) (“the board of review shall afford the parties reasonable opportunity for fair hearing and shall affirm or modify the findings of fact and determinations of the commissioner or his authorized representative”).