Yeager Unemployment Compensation Case.

Argued March 23, 1961. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Harry N. Yeager,* appellant, in propria persona.

*Sydney Reuben,* Assistant Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*H. Barton Off,* with him *Harry Rosenblum* and *Roy W. Johns,* for intervenor, appellee.

OPINION BY WOODSIDE, J., September 12, 1961:

This case involves the amount of unemployment compensation due a claimant who is unemployed because he was involuntarily retired in accordance with his employer's policy.

Harry N. Yeager, the claimant, was employed by The Atlantic Refining Co. for 41 years until August 19, 1959, when he was retired because he had attained the age of 65. Immediately prior to his retirement, he had been receiving wages of $140.40 a week.

The claimant had been a member of the Employes' Retirement System of The Atlantic Refining Company since its formation in 1927. Upon retirement, he chose an option which provides him a pension for life payable in the amount of $266.89 monthly. The claimant's monthly pension checks are drawn on an account to which both he and his base year employer contributed. The weekly pension, calculated from the monthly payments according to the statutory formula, was found by the board to be $61.

After the claimant's retirement, he applied for and received unemployment compensation in an amount over which there was no dispute until after January 1, 1960, the effective date of an amendment to the Unemployment Compensation Law which was applied by the

bureau to the claims made by Yeager for the weeks following that date.

The amendment was made to section 404(d) by the Act of December 17, 1959, P. L. 1893, 1911, 1912. Section 404(d), supra, 43 P.S. §804(d), with the language added by the 1959 amendment in italics, now reads as follows: "(d) Notwithstanding any other provisions of this section, each eligible employe who is unemployed with respect to any week ending subsequent to the *first day of January, one thousand nine hundred sixty,* shall be paid with respect to such week compensation in an amount equal to his weekly benefit rate less *the total of* (1) that part of the remuneration, if any, paid or payable to him with respect to such week which is in excess of *his partial benefit credit, and also (2) that part of a retirement pension or annuity, if any, received by him under a private pension plan to which a base-year employer of such employe has contributed which is in excess of the maximum weekly benefit rate provided for in this act. If such retirement pension or annuity payments deductible under the provisions of this subsection are received on other than a weekly basis, the amount thereof shall be allocated and prorated in accordance with the rules and regulations of the department. Retirement pension or annuity payments received by the employe under the Federal OASI program, the Federal Railroad Retirement program or under any private retirement plan to which the employe was the sole contributor, shall not be considered a deductible retirement pension or annuity payment for the purposes of this subsection.* Such compensation, if not a multiple of one dollar ($1.00), shall be computed to the next higher multiple of one dollar ($1.00)."

Applying the above provision, the bureau, the referee and the board each held the claimant to be entitled to benefits in the amount of $12 per week. The board explained the calculation as follows:

"The maximum weekly benefit rate of $38.00 provided for in the Act when deducted from the claimant's weekly pension in accordance with the aforesaid formula leaves a balance of $23.00. Further following the mandate of Section 404(d) of the Law the said sum of $23.00 must be deducted from the claimant's established weekly benefit rate of $35.00. Continuing to follow the aforesaid formula, the sum of $23.00 when deducted from the claimant's weekly benefit rate of $35.00 leaves a balance of $12.00. Therefore, under the provisions of Section 404(d) of the Law, the claimant is entitled to a weekly benefit amount of $12.00."

The claimant appealed from the board's decision contending that there was error in the board's findings three and four which were as follows: "3. The claimant was receiving pension from his base year employer in the amount of $266.89 per month. 4. The claimant's pension payments are made from a fund to which both he and his base year employer contributed."

Finding number three is not accurately stated in that the claimant is not receiving his pension directly from the employer but from a private pension plan which is associated with The Atlantic Refining Company, and to which the company contributes. The employer and the pension system are different entities, but that is not important here. The evidence supports the finding that the pension payments, which the claimant is receiving, are made from a fund to which both he and his base year employer contributed.

The claimant argues that the $266.89 which he is now receiving is merely a return of his own money, and, therefore, his employer made no contribution to the pension which he received during the weeks in question. During the time of his employment, Yeager paid into the retirement plan $5,851.98, which, by adding interest on his balance compounded annually to the time of retirement, equalled the sum of $9,504.44. The claimant

argues that until he receives this sum from the system through his monthly installments, his employer has not contributed to his retirement.

We all agree that his position is untenable. He relies upon the Internal Revenue Code of 1954, §72(d) whereunder, in circumstances such as exist here, no income tax need be paid upon the retirement allowance received during the first three years until the payments received by the retired employe total the full amount contributed by him. This provision of the Revenue Act is applicable only when the aggregate amount receivable by the employe in the first three years is equal to or greater than the amount contributed by the employe. It does not mean that the payments received by the appellant constitute a return of his own funds until the sum which he contributed is exhausted. It is an arbitrary exception to §72(b) of the Internal Revenue Code which establishes a formula based upon the taxpayer's contribution to the fund from which the pension is paid.

Upon the death of retirer, his beneficiary or estate would be paid a sum obtained by subtracting the aggregate of all retirement allowances paid to the date of death from his total contribution with interest to the date of retirement. This provision was added to the system January 1, 1951, and appears to constitute an additional liability of the employer, inasmuch as the claimant's monthly allowance does not appear to be actuarily reduced to provide the necessary money for the additional liability placed upon the total retirement fund. The appellant argues that this provision supports his position that all of the allowance which he is now receiving constitutes the return of his own money. This provision does not strengthen the appellant's position, but merely emphasizes that the system must be dealt with as a whole. When this is done there is no doubt that he is receiving retirement pay-

ments from a private pension plan to which his base year employer contributed.

To further support his position, claimant points to the annual report of the trustees of the system which contains four accounts included among which is an "Annuity Savings Account (Savings and interest of present members)".

The Rules and Regulations of the Employees' Retirement System of The Atlantic Refining Company provide for a retirement allowance which the appellant is receiving by a single check payable each month out of one fund. Both the employer and the employe have contributed to this fund. For accounting purposes, it is necessary to keep this total fund divided into separate accounts. The "allowance" is made up of an "annuity" calculated on the basis of the employee's contribution and a "pension" based upon his service and salary. Together they constitute a private pension plan to which his employer has contributed.

The retirement allowance of $61 per week is received by him under a private pension plan to which his base year employer has contributed. There is no justification in fact or in law to conclude that the claimant was the sole contributor to the fund from which he is receiving his monthly retirement allowance, or to assume that the legislature intended that all retirement payments be considered to have been made from the employe's contributions until they are exhausted, and that thereafter all such payments should be considered to have been made from the employer's contribution. Such an interpretation would, for practical purposes, nullify the amendment, as the claimant's funds under all systems would practically always cover the period for which unemployment compensation would be payable.

Although we are unanimously of the opinion that the claimant's contention is not tenable, the minority

of this Court has advanced a new concept of the amendment to section 404(d), supra. The minority has taken upon itself the function of repunctuating the amendment in order that it can be given a meaning which differs from that applied by the bureau, the referee and the board, and from that suggested by either the claimant or the employer. As far as we can determine, it has never before been suggested by anyone. The minority inserts a comma in section 404(d), supra, after "plan," and another comma after "contributed," and then concludes that the reduction of the compensation shall be only that percentage of a retirement pension or annuity which the employer contributed.

Although acts are passed without punctuation, and the punctuation which is subsequently inserted by the Secretary of the Commonwealth may be ignored, the courts should not change the punctuation of a statute in order to give it a different meaning. *The Peoples Bridge Co. v. Secretary of Highways,* 58 Dauphin 25, 41, affirmed in 355 Pa. 599, 50 A. 2d 499 (1947); *Orlosky v. Haskell,* 304 Pa. 57, 62, 63, 155 A. 112 (1931). The legislature imposed the duty of punctuating its statutes upon the Secretary of the Commonwealth, and not upon the courts. See Act of April 9, 1929, P. L. 177, §804, 71 P.S. §274. (See also Act of May 4, 1905, P. L. 384, repealed.)

The Secretary of the Commonwealth has access to information, such as the *punctuation in the bill* when it was introduced, the punctuation which may have been in any amendments made to the bill during passage and the *Attorney General's report* on the bill submitted to the Governor prior to his action on it, which are helpful in properly punctuating an act, and, of course, there is a presumption that an officer properly performs his duty.

It will be enlightening and possibly helpful to consider the circumstances under which the amendment

to §404(d) was made. The right to unemployment compensation for claimants separated for retirement reasons has been subject to much litigation and public discussion in recent years. The law is settled that an employe who voluntarily retires is not entitled to unemployment compensation. *Campbell Unemployment Compensation Case,* 180 Pa. Superior Ct. 74, 117 A. 799 (1955). Where retirement was brought about by arriving at a compulsory retirement age contained in a collective bargaining agreement or by company policy known to the retirer at the time of employment, the retirement was held to be voluntary and the retirer was denied unemployment compensation. These holdings were questioned in *Gianfelice Unemployment Compensation Case,* 396 Pa. 545, 153 A. 2d 906 (1959), where it was held that an employe who desires to continue in his employment but who is retired for age, in accordance with the terms of a company pension plan which is part of a collective bargaining agreement is eligible for unemployment compensation. The Court further held that "nothing in the Unemployment Compensation Law disqualifies a recipient of a pension from receiving unemployment compensation if otherwise eligible." This holding increased the number of pensioners qualified for unemployment compensation and intensified the discussions which were taking place in the press and in governmental circles concerning the advisability of paying unemployment compensation to a retirer who was already receiving social security benefits and pension from a private retirement plan. Cases were being cited where the private pension payments, social security benefits and unemployment compensation combined exceeded the wages which a retirer had been receiving when employed. This matter was receiving serious consideration by the Governor's Committee on Unemployment Compensation which filed its report the same week that the Supreme Court filed its opinion in the *Gianfelice* case, supra.

The Governor's Committee reported that some of its members believed that all pensioners should be declared ineligible for unemployment compensation benefits, because their retirement indicated separation from the labor force. "Other members believed that the law should be amended to limit the weekly benefit amount to which such a claimant would be eligible by use of an offset so constructed that, if such a claimant received a monthly pension payment equal to 4 1/3 times the maximum weekly unemployment benefit, he would be ineligible for any unemployment benefit payment." This statement it will be noted, made no reference to the source of the "monthly pension payment." The committee's report continues, "It was also proposed that any claimant receiving a private pension to which his base year employer contributed, which exceeds 4 1/3 times the maximum weekly benefit amount provided by law, shall be ineligible for some or all weekly benefits by offsetting from his weekly benefits the amount of his private pension in excess of 4 1/3 times the weekly benefit amount."

Shortly after this report was released and copies furnished to the legislators, H.B. 2338 was introduced. This bill became the Act of December 17, 1959, P. L. 1893, supra. We submit that the legislature accepted the most "liberal" suggestion of the committee's report, and was attempting to carry it out by the amendment to section 404(d). So far as we have been able to ascertain there was never any suggestion or discussion by the Governor's Committee or the legislature to separate a pension into that amount representing the contribution made by the employer and that amount representing the contribution made by the employe. A reading of the Committee's report leads to a conclusion that such a division of a pension payment is repugnant to *all* of their divergent views.

The historical background is not controlling, but it may be considered by us. Statutory Construction Act of May 28, 1937, P. L. 1019, §51, 46 P.S. §551.

It seems clear for another reason that the legislature did not contemplate or intend the interpretation placed upon the amendment by the minority. Were we to interpret §404(d) as suggested by the minority, it would create an insurmountable administrative obstacle, and would be impossible of execution. There are thousands of pension plans within this Commonwealth to which employers contribute. They follow no uniform policy or system. They cover from one to a hundred thousand employes. These plans are not only different, but they are involved and complicated. The evidence and argument in this case demonstrate that a lawyer, an accountant and an actuary working together find it difficult to determine accurately what percentage of the payments made from the pension plan represents contributions by the particular claimant and what percentage represents contributions made by the employer.

It would be far less difficult in this case than in most cases to separate the percentage of a pension which represents the pensioner's contribution and the amount which represents his employer's contribution because of the manner in which the system is set up. But even this case is not free from doubt. Although there was testimony here by an expert familiar with the plan that of the $266.89 monthly retirement, $82.50 represented the amount contributed by Yeager, and $184.39 represents the amount contributed by the employer, this ignores, as to both amounts, a liability of the system to provide sufficient funds to provide for the payment to the retirer's estate or beneficiary referred to above. Ordinarily, an actuary would provide this sum by reducing the amount of monthly allowances. It is at least a judiciable question whether the

employer is contributing to that part of the annuity of $82.50 which would equal the sum by which the annuity should be reduced to provide for the payments to the beneficiary or estate of the retirer.

This is typical of the unlimited number of questions which would arise under each of the thousands of retirement systems. These questions would not be confined to the cases appealed to the board, where expert witnesses can be called to testify. In the case of each retirer claiming compensation, a clerk of the bureau would be required to examine the retirement plan (this one involves 40 pages of "fine print"), and decide what percentage of the retirement payments represented contributions from the employe, and what percentage represented contributions from the employer. This is not only a mathematical or accounting problem but an actuarial problem loaded with an unlimited number of legal problems involving the interpretation of the particular retirement plan under which the claimant is receiving a pension. There are only a handful of specialists in the Commonwealth who understand the process by which such a determination can be made. It is inconceivable that the legislature would impose such a duty upon the clerks of the bureau. The legislature does not intend a result that is impossible of execution. Act of May 28, 1937, P. L. 1019, §52, 46 P.S. §552. "In construing any act which requires construction 'good sense and practical utility' are always to be considered: 1 Kent 310." *Pottsville Referendum Case,* 363 Pa. 460, 467, 70 A. 2d 651 (1950).

Decision affirmed.

DISSENTING OPINION BY FLOOD, J.:

The undisputed facts of this case are that the appellant, formerly an employe of the Atlantic Refining Company, was retired on August 15, 1959, at age 65,

in accordance with company policy. He received a monthly retirement payment which when prorated was equal to approximately $61.00 weekly. He thereupon applied for unemployment compensation which was allowed on the basis that he was involuntarily unemployed.

The Atlantic Refining Company's retirement system consists of two distinct elements, an annuity built up entirely by regular contributions by the employe, and a pension contributed entirely by the employer. The following definition in the rules and regulations of the retirement system, offered in evidence as claimant's Exhibit #1, are pertinent:

(5) "Pension" shall mean payments to a retired member made from funds provided by the Company.

(6) "Annuity" shall mean periodic payments to a retired member or other person made from funds obtained through the accumulation of the member's contributions.

(7) "Retirement Allowance" shall mean the sum of the pension and the annuity. All retirement allowances shall be paid in monthly installments.

Mr. Rebuck, the company supervisor, testified that the appellant's retirement allowance from the fund of $266.89 monthly is made up of an annuity of $82.50 and a pension of $184.39. (N.T. p. 14). Upon a weekly basis this would mean, rounded off, an annuity of $19.00 and a benefit of $43.00. The financial reports of the retirement fund to the plaintiff differentiated between the amount disbursed as annuities and the amount disbursed as pensions (Cl. Exhibit #4). . . .

Two points of contact exist between the pension fund and the annuity fund, as indicated by the rules and regulations: (1) joint management and investment of the funds and (2) an annual variation of the company's contribution, actuarially determined to keep the total payments to the retired employe level throughout

the years. We have discovered no other interrelation between the pension and the annuity funds except perhaps a death benefit provision as to which there was considerable testimony. This provision was introduced by an amendment in 1951. Although the testimony on this is not too clear, apparently the balance of the employe's contributions were lost to him prior to 1951, if he died before they were used up in retirement payments. The 1951 Amendment provided that any such balance at his death would be paid to his beneficiary. It was also provided that there should be no reduction in the retirement payments by reason of the adoption of the death benefit provision. This provision necessitated greater annual payments into the retirement fund if it were to be kept actuarially sound. These additional payments were made thereafter entirely by the company to the pension fund. The company supervisor claims that this means that the company contributes the entire death benefit fund. While the claimant disputes it, it appears probably correct. However this may be, the supervisor testified that the actuarial calculation remains the same.

It is to be noted that the 1959 Amendment, set forth in the majority opinion, providing for the deduction does not read "the retirement benefits received by the appellant under a private pension plan to which a base-year employer has contributed", but rather "that part of a retirement pension or annuity, if any, received by him under a private pension plan to which a base-year employer of such employe has contributed". This provision of the amendment may be interpreted in either of two ways: It may be read to reduce the weekly benefits provided in the act by (1) that part of a pension or that part of an annuity to which the employer has contributed which exceeds the maximum weekly benefit rate, or (2) that part of the entire pension plan, to any element of which the employer has contributed, which

exceeds that rate. Under the first interpretation the appellant's benefits, as provided in the act, of $35.00 weekly would be reduced only by the difference between the $42.00 weekly arising from the employer's contributions and the $38.00 maximum benefit rate or $4.00. This would reduce the appellant's weekly benefits from $35.00 to $31.00. Under the second interpretation, which the board followed, and the majority of this court has approved, the reduction would be $23.00 per week, reducing the appellant's weekly benefits from $35.00 to $12.00.

Since our legislature passes acts without punctuation we are not aided by punctuation inserted after passage. If we add a comma after the word "plan" to the punctuation inserted by the Secretary of the Commonwealth, the first interpretation would be the obvious and natural one. With this additional comma, the provision reads:

(2) that part of a retirement pension or annuity, if any, received by him under a private pension plan, to which a base-year employer of such employe has contributed which is in excess of the maximum weekly benefit rate provided for in this Act.

The punctuation is inserted in the official copy of the laws by the Secretary of the Commonwealth. Act of April 9, 1929, P. L. 177, §804, 71 PS §274. Since it is no part of the legislature's enactment, it is of no significance in the interpretation of the statute. Statutory Construction Act of May 28, 1937, P. L. 1019, §53, 46 PS §553; *Kuntz, to use v. Alliance Sand Co.*, 156 Pa. Superior Ct. 563, 40 A. 2d 864 (1945).[1] If all

---

[1] The majority opinion talks as though in this search for the true meaning of this ambiguous statute, the minority has changed the punctuation to suit its purposes. Our interpretation would be the same, if, as we must assume, there were no punctuation. We have not changed, and need not change, the punctuation in order to reach our conclusion but have inserted the comma in our last quo-

punctuation is eliminated, as it must be for our interpretation under the Statutory Construction Act, there is a definite ambiguity as to which of these meanings is correct. The interpretation, in the case of such ambiguity, turns upon other considerations.

The interpretation given the statute by the majority treats the return of the appellant's own contribution to the retirement system as though it were compensation received from an employer. In no other law known to us is such return so considered. We cannot accept the hypothesis that the legislature intended, in the ambiguous language of the amendment, to go so far in this direction as the majority opinion takes it.

This is remedial legislation, whose purpose is to ameliorate the hardships to wage-earners due to unemployment and to provide some security against resulting financial distress by the setting aside of reserves by both employe and employer. Unemployment Compensation Law, Act of December 5, 1936, P. L. 2897, Art. I, §3, 43 PS §752. We should therefore be slow to interpret the amendment so as to penalize the em-

---

tation from the act merely to clarify our interpretation. Consequently, we are not in any way in conflict with *Orlosky v. Haskell*, 304 Pa. 57, 155 A. 112 (1931) or *People's Bridge Co. v. Secretary*, 355 Pa. 599, 50 A. 2d 499 (1947) cited by the majority. In any event, these cases are irrelevant to this issue because they apply only when the language of the statute is unambiguous. On the contrary, we submit that the majority, insofar as it gives significance to the punctuation inserted by the Secretary, ignores the mandate of Section 553 of the Statutory Construction Act (Act of May 28, 1937, P. L. 1019, §53, 46 PS §553) to the effect that "In no case shall the punctuation of a law control or affect the intention of the Legislature in the enactment thereof". Even more vigorously do we dissent from the implication in the majority opinion that the legislature may delegate to the executive, in the person of the Secretary of the Commonwealth, either the legislative power to fix the meaning of a statute by punctuation or the judicial power to interpret a statute by punctuating it.

ploye who makes a sacrifice to get additional protection upon his retirement.

It is true that retirement benefits are not the objective of the Unemployment Compensation Law. But the employe who is involuntarily retired is entitled to unemployment compensation upon retirement if he is available for suitable work and fails to obtain it. *Smith Unemployment Compensation Case,* 190 Pa. Superior Ct. 408, 154 A. 2d 336 (1959). Since he is so entitled, the act should be liberally construed to effect its objectives as to him as well as to all other beneficiaries of its provisions.

It is also true that the employer's contribution to the private pension plan is an additional benefit to the retired employe beyond what the employer is required to furnish under the Unemployment Compensation Act. And it seems equitable that unemployment compensation payments charged against the employer's reserve account should be reduced to the extent that the retired employe is receiving weekly pension payments from the money contributed by the employer to the pension fund. However, we see nothing in the language or policy of the act requiring us in all cases to give the employer the further benefit of a reduction of the charge against his reserve account by not only the fruits of his own contribution to the private retirement plan but of the employe's contribution as well. This may happen in some cases under the language of the amendment but we see no reason to hold that it should happen where that language does not require it, as here.

The new subsection treats the three most common sources of financial return received by retired employees: (1) retirement plans entered into in connection with employment, (2) social security payments (and their equivalent for railroad employes) including old age pensions, and (3) whatever private plan an in-

dividual might set up for himself. Payments of type three, which would consist entirely of an employe's capital plus interest thereon, are plainly not deductible from unemployment compensation benefits under the subsection. Neither are payments of type two, social security payments, including old age pension payments, which are derived in part from contributions by the employe and might be considered to some extent a return of his contributions plus interest. This makes it seem to us most unlikely that in type one the legislature, by the ambiguous language of the amendment, intended to reduce his unemployment benefits by that part of the retirement plan payments which represent a return of the employe's own money, at least when, as here, that part is clearly severable.[2]

Under our interpretation of the statute $42.00, the approximate sum contributed by the employer to appellant's pension when prorated on a weekly basis, is the amount from which his maximum weekly benefit rate, $38.00, should be deducted. This leaves a balance of $4.00 which when deducted according to Section 404(d) from appellant's established weekly benefit rate of $35.00 indicates that the appellant is entitled to unemployment compensation of $31.00 weekly.

The majority seems to believe that the legislative history is contrary to our interpretation. Laying aside "discussion in government circles and in the press" which have not been called to our attention in the briefs or otherwise, we have nothing of record by way of legislative history except the Governor's message,

---

[2] Cf. the refusal of the Supreme Court to interpret the vacation pay amendment of March 30, 1955, P. L. 6, to cover anything other than vacation periods, partially, at least, upon the theory that this is additional annual compensation for the employe's services, not to be deducted from unemployment compensation payments due for non-vacation periods. *Piesrak Unemployment Compensation Case*, 404 Pa. 527, 172 A. 2d 807 (1961).

quoted in part by the majority. Nothing in that message, as we read it, or as the majority discuss it, gives the key to the interpretation of the clause before us.

Finally the majority suggest that an insurmountable administrative obstacle, making the act impossible of execution under our interpretation, prevents the court from attributing such an intention to the legislature. However, they understandably stop short of labelling it impossible of execution in the case before us. The majority suggestion of impossibility in other undescribed situations is more imaginative than convincing to one who approaches the interpretation of this statute with reference specifically to the retirement system we are here considering.

ERVIN, J., joins in this dissent.