**UNITED STATES STEEL CORPORATION (USX CLAIRTON WORKS), Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2002.

Decided March 6, 2003.

---

Michael P. Duff, Pittsburgh, for petitioner.

Maribeth Wilt–Seibert, Harrisburg, for respondent.

John Stember, Pittsburgh, for intervenor, W. Wilson.

Richard E. Gordon, Pittsburgh, for amicus curiae, The United Steel Worker's of America.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge COHN.

United States Steel Corporation (Employer) appeals from multiple orders of the Unemployment Compensation Board of Review (Board) that affirmed the decisions of a referee to allow Employer only a 50% offset for pension benefits pursuant to Section 404(d)(2) of the Unemployment Compensation Law, (Law) Act of December 5, 1936, P.L. (1937) 2897, *as amended*, 43 P.S. § 804(d)(2). The appeals have been consolidated in our Court for consideration. Employer argues that a 100% deduction of Claimants' pension benefits from their unemployment compensation is appropriate because the pension had been completely funded by Employer. The Board, in allowing only a 50% deduction, determined that this situation is governed by this Court's decision in *Ehman v. Unemployment Compensation Board of Review*, 776 A.2d 1031 (Pa.Cmwlth.2001), *petition for allowance of appeal denied*, 567 Pa. 767, 790 A.2d 1020 (2001), because Claimants allege that they gave up a cost of living adjustment (COLA) in exchange for greater pension contributions from employer. The issue before the Court is whether Claimants have "contributed" to

their pension within the intent of Section 404(d)(2) of the Law.

The following facts are pertinent.[1] Claimant filed an application for unemployment compensation benefits, effective July 22, 2001, and established financial eligibility based on wages paid by Employer. For the weeks ending August 4, 2001 through September 15, 2001, he received full unemployment benefits reduced only by his part-time wages. During the weeks at issue, he also received a monthly retirement pension from Employer in the amount of $1,830.00. Adjustments were not made to his weekly benefit rate for his pension benefits until September 21, 2001, although the Job Center was aware that he was receiving a pension from his prior employment with Employer. This resulted in four weeks of excess payments of $212.00 per week. Thereafter, the pension was taken into account and his weekly benefit amount was reduced by 50% pursuant to Section 404(d)(2).

Regarding the substantive issue, the referee found that Claimant receives his pension from a fund administered by Employer's Carnagie Pension Plan (Plan). Contributions to the Plan are normally made by Employer only. The amount of Employer's contributions is governed by an agreement between Employer and the United Steelworkers of America (Union). The agreement executed in 1977 between the parties was to expire on July 31, 1980. The 1977 Agreement provided that employees would receive a COLA in May, 1980. Before the 1977 Agreement expired, and before the COLA could take effect, the parties entered into a settlement agreement, dated April 15, 1980, that succeeded the 1977 agreement. The primary issue concerning the parties when they entered into the settlement agreement was enhancement of pension funding. Under the terms of the 1980 settlement agreement, *inter alia*, the employees gave up the COLA that was to begin in May, received a 25 cent general pay increase, and Employer made a lump sum payment into the pension fund. Retirees and future retirees became eligible for increased pension benefits. The lump sum payment made by Employer was placed directly into the general pension fund administered under the Plan; no special fund or account was created for the disbursement of these monies. Claimant had been employed by Employer in May of 1980 and, therefore, would have been eligible for a COLA had one been disbursed as originally agreed.

As already explained, Claimant's application for unemployment compensation benefits was granted and the benefits were reduced by the amount of part-time wages he had earned in another job. The Bureau of Unemployment Security (Bureau) allowed for only a 50% deduction for his pension benefits and Employer appealed seeking a 100% deduction.[2] The referee applied this Court's decision in *Ehman* and affirmed the 50% pension deduction on the basis that Claimant's "give-back" of the COLA constituted a contribution to the pension plan under Section 404(d). Employer appealed and the Board summarily

---

1. Wayne Wilson (Claimant) has been selected as the lead claimant for similarly situated employees and we take the findings from his adjudication.

2. As previously noted, Claimant reported his part-time wages to the Bureau and it was aware he was receiving the pension from his prior employment. However, adjustments were not made to Claimant's weekly benefit rate as a result of receiving a pension until September 21, 2001. He, thus, received an excess of his entitlement and the referee imposed an overpayment that is not at issue here.

affirmed the referee. This appeal by Employer followed.

■ On appeal, Employer argues, *inter alia*, that *Ehman* should be overruled, asserting that employees will always allege that they "gave up" something to the employer in negotiations so that more money could be contributed to the pension fund and that, as a practical matter, this will eliminate the 100% statutory deduction. Employer also asserts that *Ehman* creates federal tax issues because what the employee gave up is not treated as gross income. Finally, Employer argues that *Ehman* can be distinguished from the case *sub judice* because *Ehman* involved present employees rather than retirees. Employer also argues that in *Ehman* the employees were already receiving the COLA in their paychecks and that, after they gave the COLA back to the employer, their paychecks reflected a lower amount, whereas, here, the COLA was to take effect, if at all, in the future.

The Claimants assert that *Ehman* is on point and should be followed because the Law should be liberally construed to benefit employees. They also assert that this Court should not be bound by the Internal Revenue Code definition of "contribution" and that the federal tax issue is a "red herring."

The Board takes the position that the matter *sub judice* is controlled by *Ehman*, but would like to see that case overruled. It argues that, under federal law, it is required to make a prompt decision regarding an application for unemployment benefits and that, where it must investigate the history of labor negotiations span-

ning decades, it is difficult, if not impossible, to do so.[3]

The United Steel Workers of America have filed an amicus brief in support of the Claimants and they argue that the finding that the Claimants exchanged their present COLA entitlement for pension enhancements for both present and future retirees is supported by the record, that Claimants "contributed" to their pensions within the meaning of Section 404(d)(2) and that there is no reasonable basis to overrule *Ehman*.

■ Our scope of review is limited to determining whether the Board's adjudication is in violation of constitutional rights, whether an error of law was committed, or whether the factual findings are supported by substantial evidence. *Nolan v. Unemployment Compensation Board of Review*, 797 A.2d 1042, 1045 n. 4 (Pa.Cmwlth.2002). Substantial evidence is that which a reasonable mind, without weighing the evidence or substituting its judgment for that of the factfinder, might accept as adequate to support the conclusion reached. *Centennial School District v. Department of Education*, 94 Pa.Cmwlth. 530, 503 A.2d 1090, 1093 n. 1 (1986), *affirmed*, 517 Pa. 540, 539 A.2d 785 (1988). The Board is the ultimate factfinder and is empowered to make credibility determinations. *Peak v. Unemployment Compensation Board of Review*, 509 Pa. 267, 501 A.2d 1383 (1985). In making those determinations, the Board may accept or reject the testimony of any witness in whole or in part. *Greif v. Unemployment Compensation Board of Review*, 68 Pa.Cmwlth. 437, 450 A.2d 229 (1982).

---

**3.** The Claimants assert that Employer has waived any argument that the *Ehman* case should be overruled because that point was not raised in the petition for review. However, Employer did not need to specifically re-

quest the overruling of precedent. Should an inconsistency in the law result from the Court's decision, the Court would need to address such an inconsistency in any event.

Our consideration of this issue is governed by the statutory provision establishing a deduction from unemployment compensation payments where a claimant is also receiving an employer-funded pension. Section 404 of the Law pertinently provides:

Compensation shall be paid to each eligible employe in accordance with the following provisions of this section . . .

(d)

. . . .

(2) (i) In addition to the deductions provided for in clause (1), for any week with respect to which an individual is receiving a pension, including a governmental or other pension, retirement or retired pay, annuity or any other similar periodic payment, under a plan maintained or contributed to by a base period or chargeable employer, the weekly benefit amount payable to such individual for such week shall be reduced, but not below zero, by the pro-rated weekly amount of the pension as determined under subclause (ii).

(ii) **If the pension is entirely contributed to by the employer, then one hundred per centum (100%) of the pro-rated weekly amount of the pension shall be deducted. If the pension is contributed to by the individual, in any amount, then fifty per centum (50%) of the pro-rated weekly amount of the pension shall be deducted.**

43 P.S. § 804(d)(2) (emphasis added).

The critical question is what constitutes a "contribution" within the meaning of the above-emphasized language. In *Ehman,* the Court noted that employees of Latrobe Steel had negotiated through their union for a COLA that they had actually begun to receive. Later they agreed to give back the COLA in exchange for the employer using that money in perpetuity, *inter alia,* to increase the pension benefits of past and present employees. The Court characterized this action as an exchange of cost of living adjustments in return for pension benefits and found that there was a "contribution" because the exchange was a substitute for an actual monetary contribution. In *Ehman,* the referee had allowed for a 50% pension offset and the employer appealed. The Board reversed, relying on, *inter alia, Latella v. Unemployment Compensation Board of Review,* 74 Pa.Cmwlth. 14, 459 A.2d 464 (1983). We summarized its rationale as follows:

The Board cited Latella . . . where the Court stated that the former Section 404(d)(iii), *formerly* 43 P.S. § 804(d)(iii), deleted by Section 4 of the Act of October 19, 1988, P.L. 818, which reduced claimants' unemployment compensation benefits by 100 percent of their Social Security pension benefits, regardless of whether they had contributed to those benefits, was rationally related to the legitimate government objectives of promoting the fiscal integrity of the unemployment compensation fund and of eliminating payment of duplicative, "windfall" benefits. In *Lacks v. Unemployment Compensation Board of Review,* 164 Pa.Cmwlth. 215, 642 A.2d 603 (1994), this Court stated that the current Section 404(d)(2) is nearly identical to the former Section 404(d)(iii) and has the same objectives. The Board stated that the "give back" of the COLA was not a contribution for purposes of Section 404(d)(2). It held that Employer made all contributions to the pension fund and held that Ehman was ineligible for benefits.

*Ehman,* 776 A.2d at 1033–34.

In reversing the Board in *Ehman,* we were persuaded by the employees' arguments that ceding the COLA was a "contribution" to the pension fund within the meaning of Section 404(d). We were not

persuaded by the employer's arguments that (1) under 29 U.S.C. § 1102(a), pertaining to establishing employee benefit plans under what is colloquially known as ERISA,[4] every such plan must be established by a written agreement, (2) under the Internal Revenue Code contributions are contemplated as being through payroll deductions, not intangibles such as a decision of a collective bargaining agent and (3) consistency in unemployment matters is important and allowing a contractual exchange of benefits to substitute for an actual monetary contribution provides an unworkable framework.

We begin by noting that our research has turned up no general definition of the term "contribution" in the Law, ERISA or the Internal Revenue Code. Indeed, ERISA and the Internal Revenue Code definitions focus on many different types of plans that involve contributions. However, as we observed in *Ehman:*

> Because Pennsylvania law is silent on what constitutes employee contributions, the Court should look to federal law. In 26 U.S.C. § 414(h)(1) [Internal Revenue Code] it is provided that any amount contributed to a qualified plan shall not be treated as having been made by the employer if it is designated as an employee contribution. Employer quotes a United States Tax Court memorandum opinion, *Alderman v. Commissioner,* T.C. Memo. 1988–49, which states: "The distinction between an employER and an employEE contribution is important for Federal income tax purposes as it affects the timing of inclusion in the employee's taxable income of those contributions."

Employer notes further that 29 U.S.C. § 1102(a) requires that every employee benefit plan be established by a written instrument and that no unwritten portion or amendment is enforceable. Here the only references in the pension plan and pension agreements are to contributions by Employer. In addition, the annual report required by ERISA and by federal tax law, the periodic audit conducted of the pension plan, the summary plan description provided to participants and W–2 Forms provided to Ehman and others did not show contributions made by employees. Employer notes that Ehman did not present evidence that he paid tax on the $0.33 per hour COLA payments. It argues that the Internal Revenue Code contemplates contributions through payroll deductions or delivery of a check or cash to the plan administrator, not the use of an intangible, such as the decision of a collective bargaining agent to trade an employee's right to a COLA in favor of retirement benefits. Also, Employer maintains that Ehman's own evidence shows that enhanced pension benefits were for those already retired and those who retired under the 1980 pension agreement, categories that do not include Ehman.

*Ehman,* 776 A.2d at 1035.

Despite this language, the *Ehman* Court, relying on the provision that the Law should be liberally interpreted to allow benefits, held that the COLA concession could be construed as a contribution under Section 404(d)(2) of the Law. The Court stated:

> We do not agree with Employer that the failure to treat the money at issue here as a direct employee contribution for

---

**4.** Employee Retirement Security Income Act.

ERISA reporting and related purposes means that the money may not be regarded as an employee contribution for purposes of Section 404(d)(2)(ii). The memorandum Tax Court case cited by Employer, *Alderman v. Commissioner*, notes that where mandatory employee contributions to a plan are "picked up" by a state or local government employer but the employer withholds that amount from the employees' salary, the effect is the same as employee contributions under 26 U.S.C. § 414(h)(2).

*Id.* at 1037.

Rather than focusing on a Tax Court case that interpreted provisions enacted to provide a federal tax deferral, we think it more prudent in the case *sub judice* to concentrate on the history of the labor negotiations and the policy behind the Law. In so doing, we quote at length from Employer's brief since no factual findings regarding the background of these labor negotiations in the matter *sub judice* have been made. This background information appears to be uncontested; the dispute surrounds which retirees were to benefit from the pension improvement.

The factual underpinnings of this case date back to the 1980 negotiations between the United Steelworkers of America ("Union") and the Coordinating Committee Steel Companies ("CCSC") which included almost all the major integrated, unionized steel producers who banded together to negotiate wages, hours and other terms and conditions of employment with the Union. (R. 19a, 33a) In 1980 the CCSC included USS, Bethlehem Steel, J & L Steel, Republic Steel, Armco, and National Steel. (R. 19a) Historically, the agreement between the CCSC and the Union often set the pattern for agreements between smaller steel companies and their employees (R. 34a), although there were certainly deviations from the basic pattern in the case of the smaller companies. Companies such as Latrobe Steel and Washington Steel did not participate in the bargaining with the CCSC members and were not necessarily familiar with the details of the agreements reached in such bargaining. (R. 19a, 33a)[2] Further, the agreements negotiated by these smaller companies did not necessarily include or incorporate all of the specific agreements reached between the CCSC and the USWA.

[2] In fact, the CCSC/USWA negotiations that concluded in April 1980 ended well before June, 1980 when the Latrobe Steel negotiations involved in the *Ehman* case began. Further, while claimants would have this Court believe otherwise, the negotiations of these smaller companies are clearly irrelevant to the CCSC/USWA negotiations.

In 1980, the CCSC and the Union negotiated under the aegis of the Experimental Negotiating Agreement ("ENA"), which essentially provided for early (i.e. several months before the end of the contract) negotiations and an arbitration end point in the event that the parties did not reach agreement. (R. 19a) In 1980, however, the parties managed to reach agreement without arbitration. On April 15, 1980 the parties signed a "Settlement Agreement" (Emp. Ex. 1, R. 94a; R. 24a) which embodied the changes that were to be made to the 1977 CCSC labor and employee benefits agreements. (R. 19a, 24a)

In 1980 the CCSC and the Union employed the same structure for the negotiations which had been used in the past. That is, there was a top committee for both parties and under the top committee were a benefits committee and a contract language committee that worked out many of the intricate prob-

lems confronted by the negotiators. (R. 19a–20a) USS' main witness in this case, James T. Carney, was a member of and counsel to the CCSC benefits committee. (R. 20a)

The 1980 negotiations were made particularly difficult by the fact that in advance of the negotiations, the Union Steel Industry Conference, which was responsible for formulating the Union negotiating objectives, "... made the achievement of substantial pension improvements for already retired employees an absolute priority in these negotiations. It was understood and widely agreed that this item was so important that the Conference was willing to apply monies which otherwise would have gone to active employees if necessary to secure this benefit." (Emp. Ex. 2, p. 2—USWA's Summary of the Basic Steel Settlement; R. 96a—this Summary was a document prepared by the USWA law department and distributed to the local presidents for ratification of the Settlement Agreement. (R. 27a))

At the start of the April 1980 negotiations, the Union Benefits Committee members had presented its demands for improvements in the pensions payable to current employees (including claimants here), as well as for increases in the pensions of those individuals currently on pension (*current retirees*),[3] The CCSC Benefits Committee members advised that there was no way that the industry could afford to provide improved pensions for current employees and increase pension benefits for *current retirees*. (R. 20a–21a) The Benefits Committees of each party argued over this issue for some period of time, ultimately causing a deadlock in the negotiations. (R. 21a–22a)

The Top Committees broke the deadlock by a compromise. (R. 22a) The Top Committees agreed that the COLA (Cost of Living Adjustment) which would become payable on May 1, 1980 (and the amount of which was known in April) would be cancelled, thereby reducing the CCSC's anticipated wage costs, and pension benefits for *current retirees* would be improved by a complex formula spelled out in a four page letter contained in the 1980 Settlement Agreement. (R. 23a) The result of this horse trade was that the current employees gave up a future (albeit near future) increase in wages specifically in order to secure pension benefit improvements for the *current retirees*. (R. 40a)[4] There was no agreement to increase pension funding.

The "deal" was explained quite candidly to the presidents of the local union in the USWA Summary cited earlier. Specifically, the Summary provided:

"It was not possible to convince the Companies, in their present economic condition, to absorb the full cost of the substantial gains for active employees achieved in these negotiations *plus* the full cost of substantial pension improvements for already-retired employees. Therefore, money had to be applied from somewhere in the 'package' if the pension improvements for retirees were to be achieved. The ultimate solution was to apply the cost of living adjustment which would have been payable on May 1, 1980 for this purpose. *(It should be noted that the other money which will become effective on May 1, 1980—the $.25 general wage increase and the $.01 increment—exceed in value the COLA payment which was due that date.)* " (emphasis supplied) (Emp. Ex. 2, p. 2; R. 96a)

[3] In the Record the terms "current retirees" and "past retirees" are used interchangeably to refer to those indi-

viduals who had retired prior to the April 1980 negotiations. Likewise, the terms "current employees" and "future retirees" are used interchangeably to refer to those individuals, including claimants, who retired after the April 1980 negotiations.

[4] Although the pension improvements for the *current retirees* increased the liabilities of each company's pension fund, it did not necessarily translate into an increase in pension funding. Pension funding increases could have been avoided if (1) the pension plan had a surplus, (2) the pension plan realized greater investment gains in the future then were anticipated by the plan's actuary or (3) actuarial experience improved because, for example, there were fewer plant shutdowns than had been experienced. This deal was extremely unpopular with employees who believed that their interests had been sacrificed by the Union for the benefit of the *current retirees.* (R. 59a) [5]

The record clearly shows that the Union traded the future COLA for improvements in pension benefits payable to individuals already retired, not for future retirees such as claimants. This is evidenced by the USWA's own Summary of the 1980 Settlement (Emp.Ex.2, R. 96a), by the testimony of James T. Carney who wrote the language in the Settlement Agreement implementing the deal (R. 22a–25a), and by Employer Exhibit 3, a letter which USS Chairman David M. Roderick sent to all USS management on May 15, 1980 and which contained an attachment describing the settlement. (R. 98a–101a) This attachment contained the following paragraph:

> "The COLA which, in accordance with the provisions of the August 1, 1977 Agreements would have otherwise become effective May 1, 1980 will not be paid as a COLA adjustment but will be applied to the cost of pension benefit increases for *current retirees.*" (emphasis added)(R. 99a) [6]

[5] The unpopularity of the deal lead [sic] to less candid discussions of it in ensuing union communications such as Exhibit 4D, entitled "Steel 1980"—a document apparently prepared by an unknown source in the Union at an unknown date—which inaccurately stated that the give back had been used to improve pension benefits for both the active employees as well as for the retirees. Notwithstanding the foregoing, however, USS submits that Exhibit 4D is inadmissible and should not be considered by this Court.

[6] The reference to "current retirees" in this May 15, 1980[sic] is clearly intended to identify those individuals who were already retired at that time, or what have been referred to as *"current retirees "* throughout this brief.

Thus, there can be no dispute that the future COLA was surrendered only for the pension improvements of those already retired, *not* for employees, such as claimants here, who would retire in the future.

However, as the Union observed in its Summary of the Settlement Agreement, the surrender of COLA was to some extent a matter of smoke and mirrors. The reality was that in place of the May 1980 COLA the Union negotiated a $.25 per hour wage increase that was, according to the Union, more valuable than the COLA adjustment. (Emp. Ex. 2, p. 2; R. 96a) The reason that the wage increase was more valuable than a COLA payment was that COLA was an add on to wages which was not used for the calculation of other benefits until it was later rolled into wages; even when it was rolled into wages, however, it was

not used for the purpose of pension calculation. (R. 40a) The $.25 per hour wage increase, on the other hand, was used for the purposes of calculating all employee benefits including overtime and pension as soon as it was granted—which is why the Union said it was more valuable than the May, COLA increase. (Employer's Brief, pp. 5–9.)

■ As has been previously noted, the intent of the General Assembly in enacting the provisions providing for a reduction in benefits pursuant to Section 404(d)(2) was to preserve unemployment funds for those who really need them. *Attenberger v. Unemployment Compensation Board of Review*, 682 A.2d 68 (Pa.Cmwlth.1996). The pension provision, which requires that the weekly benefit rate be reduced by the amount of a pension, is intended to promote the fiscal integrity of the unemployment compensation fund and to eliminate payment of what are considered to be, duplicative, windfall unemployment benefits to individuals who, "primarily because of their retirement eligibility, are receiving adequate wage replacement income and thus experiencing greater economic security than those less fortunate." *Latella*, 74 Pa.Cmwlth. 14, 459 A.2d 464, 468–69. This provision bears a rational relation to the stated objectives of the Law. *Latella*. As we explained in *Novak v. Unemployment Compensation Board of Review*, 73 Pa. Cmwlth. 148, 457 A.2d 610, 613 (1983), "[o]ff-setting a person's entitlement to benefits by amounts received through pensions preserves the unemployment funds for those people whose only hope of relief from sudden unemployment rests upon the funds maintained by the unemployment compensation reserves. The spread of indigency is therefore slowed down by the preservation of funds for those who truly need them."

Additionally, a state pension offset or deduction is specifically required in Section 3304(a)(15) of the Federal Unemployment Tax Act (FUTA),[5] which provision also permits states to "provide for limitations on the amount of any [unemployment compensation benefit] reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment...." Further, the 1980 amendment to FUTA effectively relaxed

---

**5.** 26 U.S.C. § 3304(a)(15) provides:

[T]he amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week except that—
(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—
(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and (ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law), services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment, and
(B) the State law may provide for limitations on the amount of any such reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment....
(Emphasis added.)

the earlier federal requirement of a dollar-for-dollar offset of pension benefits against unemployment benefits. *Cardarelli v. Department of Employment and Training,* 674 A.2d 398, 400 (R.I.1996). The FUTA, however, does require, as a condition for granting federal unemployment-tax credits to employers in each state, that the state unemployment compensation law conform to certain minimal federal requirements. 26 U.S.C. § 3304(a)(15)(A).

Having now reviewed the relevant statutory framework, we turn to caselaw. Other states that have addressed this issue have determined that a direct contribution from the employee is required. For example, in *Cardarelli,* the Rhode Island Supreme Court was faced with the same issue we are addressing here and in reviewing its own pension offset provision [6] found that there had to be a direct out-of-pocket monetary contribution to the pension, and that workers who gave up other items in union negotiations did not meet the standard. Its rationale was as follows:

> Here, 26 U.S.C. § 3304(a)(15)(B) provides that "the State law may provide for limitations on the amount of any * * * reduction to take into account *contributions made by the individual for the pension,* retirement or retired pay, annuity, or other similar periodic payment." (Emphasis added.) In applying the above-mentioned canons of statutory construction, we are of the

opinion that the Legislature intended "contributions made by an individual for the pension" to include monetary contributions only.

We note that 26 U.S.C. § 3304(a)(15) refers to contributions in two instances. *See In re Advisory Opinion to the Governor,* 504 A.2d 456, 462 (R.I.1986) (quoting *Howard Union of Teachers v. State,* 478 A.2d 563, 566 (R.I.1984) ("the meaning of a word or words in a statute can become clear by reference to other words in the statute")). In the first instance, 26 U.S.C. § 3304(a)(15)(A) provides that an employer may "contribute[ ] to" an employee's pension fund on behalf of the employee. These contributions are generally considered monetary in nature. In the second instance, 26 U.S.C. § 3304(a)(15)(B) refers to "contributions" as "contributions made by the individual for the pension." We are not persuaded by plaintiff's contention that the Legislature intended the meaning of the word "contributions" in § 3304(a)(15)(B) to include nonmonetary as well as monetary contributions. Such a construction would be inconsistent with the obvious meaning of the phrase "contributed to" found in § 3304(a)(15)(A). Therefore, mindful of our settled rule that we "will not interpret legislative enactments in a manner that renders them nugatory or that would produce an unreasonable result,"

---

**6.** The Rhode Island statute specifically provides:

> An individual is disqualified from receiving benefits for any week of his or her unemployment within any period with respect to which that individual is currently receiving or has received retirement income in accordance with the following provisions:
>
> (1) The amount of compensation payable to an individual for any week which begins in a period with respect to which that individual is receiving a governmental or other pension, retirement or retired pay, annuity,

> or any other similar periodic payment which is based on the previous work of that individual shall be reduced, but not below zero, by an amount equal to fifty percent (50%) of the amount of that pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to that week, if that deduction is required as a condition for full tax credit against the tax imposed by the Federal Unemployment Tax Act (26 U.S.C. §§ 3301–3311).
>
> G.L.1956 § 28–44–19.1.

*Defenders of Animals, Inc. v. Department of Environmental Management,* 553 A.2d 541, 544 (R.I.1989), we conclude that Congress intended 26 U.S.C. § 3304(a)(15)(B) to take into account those individuals who furnish money for their pension and that nonmonetary contributions to a pension fund should not be considered when determining an offset against an individual's unemployment compensation.

The record before us yields no evidence to show that the employee contributed to his pension fund in any way. The plaintiff's pension plan was a result of a collective-bargaining agreement between his union and a former employer. In the instant case, as the trial judge noted, the plaintiff did not make any direct, out-of-pocket contribution to his pension plan.

*Id.* at 400–401. Similarly, in *Belmont v. State Dept. of Labor,* 745 P.2d 75 (Alaska 1987), although the state statutory language was slightly different,[7] the Supreme Court of Alaska found that the language evidencing the employee's contribution needed to be in the plan. In so doing, it noted that:

> The statute does not make a distinction for amounts contributed as pension plan payments pursuant to a collective bargaining agreement. Rather, the statute simply states that the requirements of AS 23.20.362(a) apply if "(1) the pension, retirement or retired pay, annuity, or similar periodic payment is provided under a plan maintained or contributed to

by an employer of the insured worker...." There is no question that Belmont's employer made the contributions to the pension plan. Therefore, under a straightforward application of AS 23.20.362, we conclude that the Commissioner and the superior court correctly held that Belmont's weekly unemployment insurance benefits be reduced by the amount attributable to his pension plan payments.

*Id.* at 78.

Based upon review of the statutory framework, caselaw from other jurisdictions, as well as the record in the case *sub judice,* it is now apparent that the difficulties of proof in allowing pension offset decisions to be guided by collective bargaining negotiations renders the *Ehman* doctrine unworkable from a practical standpoint. For example, Employer, here, was forced to call as a background witness a labor lawyer who had acted as a negotiator for U.S. Steel from 1967–1989. This individual was at no time employed by Employer but, because Employer, as a smaller steel company, followed the lead of giants such as U.S. Steel in labor negotiations, this background information explaining the climate for negotiations and the rationale behind any COLA give back or give up was needed. Similarly, the Union's primary witness was someone who had been employed since the 1960's, was active in the 1980 bargaining process and could supply the background from the Claimants' point of view. However, it may be increasingly difficult to locate individu-

---

7. Alaska Statute 23.20.362 provides in part:
   Disqualifying or deductible income.
   (a) The amount of benefits payable to an insured worker for a week of unemployment which begins in a period for which the insured worker receives a pension, retirement or retired pay, annuity, or similar periodic payment that is based on the previous work of the insured worker, shall be reduced by the amount of the payment that is attributable to that week. . . .
   (b) The reduction of benefits provided in (a) of this section does not apply to that part, if any, of a pension, retirement or retired pay, annuity, or similar periodic payment that is attributable to contributions of the insured worker.

als who can supply the rationale for various concessions made by the parties for purposes of collective bargaining. Additionally, the settlement agreement here is long and complex and contains various appendices which cross reference each other and are difficult for the layperson to follow. Keeping in mind the priority that has been placed on the quick disposition of unemployment compensation claims, *see, e.g., McNeill v. Unemployment Compensation Board of Review*, 510 Pa. 574, 511 A.2d 167 (1986),[8] we conclude that the *Ehman* analysis, which requires this much in-depth consideration of the events occurring decades ago, is at odds with the purpose of the Law. There is wisdom in Section 1102(a) of ERISA, which requires that important matters, such as employee contributions, be memorialized in a written instrument.

While we are cognizant of Claimants' reliance on *Penn Hills School District v. Unemployment Compensation Board of Review*, 496 Pa. 620, 437 A.2d 1213 (1981), where our state Supreme Court noted that benefits are presumed unless there is an explicit provision disallowing them; here, we conclude that the meaning of the word "contribution" in the pension deduction provision, as interpreted by this Court, ***does*** provide explicit statutory language for disallowing a one hundred percent pension deduction. Further, the more recent amendatory history to that provision cannot be totally ignored and it is important to note that the one hundred percent offset that previously existed has been changed to fifty percent where a claimant has made contributions to a pension fund. This change may well have been to make the results more equitable where a claimant had actually contributed to the pension plan. Additionally, it bears noting that the current offset is phrased as a *percent* rather than a dollar for dollar offset, making the calculations less, rather than more, complicated.[9] While the amendments have softened the Law's affect vis a vis claimants, the legislature did **not** choose to establish a provision allowing for indirect pension contributions as we have in the case *sub judice*. The apparent difficulties of proof in such a case provide a sound basis for its disinclination to do so.

As the Board rightly maintains, prompt decisions are vital to the subsistence of fellow citizens who are out of work. (Board's brief at p. 8, *citing Peak*, 509 Pa. at 274, 501 A.2d at 1387. "Swift disposition of many of the cases before it is vital to the subsistence of our fellow citizens who suffer lack of work."). *See also McNeill* (recognizing that the Board's own procedural rules were formulated for quick disposition of claims). And, it cannot be gainsaid that the Board has the daunting task of deciding thousands of cases each year. *See Merida v. Unemployment Compensation Board of Review*, 117 Pa. Cmwlth. 181, 543 A.2d 593 (1988), *appeal dismissed*, 524 Pa. 249, 570 A.2d 1320 (1990).

Moreover, it bears emphasizing again that Pennsylvania's unemployment system receives federal funding. *Tenaglia v. Un-*

---

8. The Court noted in *McNeill* that the legislature created the Law because it found economic insecurity due to unemployment to be a menace to welfare and morals and that the Board's procedural rules were, thus, formulated to obtain the quickest possible disposition of claims.

9. Prior to the 1988 version of the pension provision, the offset provision under the 1959 amendment recognized an offset for a claimant only if he was the *sole* contributor to his pension. *See* Section 6 of the Act of March 30, 1955 P.L. 6. *See also Yeager v. Unemployment Compensation Board of Review*, 196 Pa.Super. 162, 173 A.2d 802 (1961) (discussing 1959 amendment).

*employment Compensation Board of Review,* 73 Pa.Cmwlth. 453, 458 A.2d 331, 333 n. 5 (1983). Therefore, we must comply with federal mandates. The United States Supreme Court has held that under Section 303(a)(1) of the Social Security Act, 42 U.S.C. § 503(a)(1), the "when due" provision requires payment of unemployment compensation benefits promptly after an initial determination of eligibility. *California Department of Human Resources Development v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971).[10] The High Court held that the word "due," employed here, "means the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; any other construction would fail to meet the objective of early substitute compensation during unemployment." *Id.* at 133, 91 S.Ct. 1347. The subsequent adoption of federal timeliness guidelines[11] lends further support to the importance of payments swiftly reaching unemployed claimants. Where litigation involves exploring the basis for a collective bargaining agreement, which may require investigating poorly documented matters that might have occurred decades ago, discovery and litigation are severely hampered and unduly prolonged. We conclude

that such a result was, in fact, ***not*** contemplated by our legislature when it passed the pension offset provision. *See* Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(1) (legislature does not intend an absurd or unreasonable result).[12]

For the foregoing reasons, we expressly overrule *Ehman* and now hold that, in order for employees to receive only a 50% pension offset, there must be a line-item deduction appearing on the pay stub or a specific provision in the pension plan indicating a contribution to the pension fund has been made by the employee.[13]

The order of the Board is reversed.

## ORDER

**NOW,** March 6, 2003, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby reversed.

## DISSENTING OPINION BY President Judge COLINS.

I dissent. The record reflects that during settlement negotiations the employees waived their scheduled COLA in exchange

---

**10.** "The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State ... includes provision for ... (1)[s]uch methods of administration ... as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation **when due.**" 42 U.S.C. § 503(a)(1) (emphasis added).

**11.** See 20 C.F.R. § 650.1 (2001).

**12.** Additionally, we note that the Board persuasively argues that the *Ehman* case "could arguably encourage employers and employees to contrive a *de minimis* wage concession, calculated to double unemployment benefit

entitlement and supplement generous pension plans at the fund's expense." (Board's brief at p. 9). Such a result would allow the use of the fund for purposes other than those for which it was intended and could jeopardize its solvency. *Department of Labor and Industry v. Unemployment Compensation Board of Review,* 418 Pa. 471, 485, 211 A.2d 463, 470 (1965).

**13.** Of course, in the context of the collective bargaining process, the parties may still negotiate over pension issues. But, to the extent they wish unemployment compensation to be affected, those negotiations will need to be memorialized in the pay stubs or pension plan.

for a wage increase and a lump sum payment into their pension fund. Forbearance equals consideration; therefore, the employees contributed to the pension plan within the meaning of Section 404(d)(2) of the law. The Board as the ultimate fact finder so found, and the Board properly applied *Ehman v. Unemployment Compensation Board of Review,* 776 A.2d 1031 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 567 Pa. 767, 790 A.2d 1020 (2001), which decided the issue.

Accordingly, I would affirm the Board.

Judge SMITH–RIBNER joins in this dissent.